CHAS. A. STEVENS AND COMPANY, Petitioner-Appellant, v. THE HUMAN RIGHTS COMMISSION et al., Respondents-Appellees.

First District (3rd Division)   No. 1—88—2138

Opinion filed March 30, 1990.

Ashman & Associates, of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and William H. London, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

Carey, Filter, White & Boland, of Chicago (Edward. M. White and Daniel R. Harper, of counsel), for respondent Dorothy Green.

JUSTICE RIZZI delivered the opinion of the court:

Appellant, Chas. A. Stevens (Stevens), appeals from the order of the Illinois Human Rights Commission (Commission) which found that Stevens had discriminated against Dorothy Green (Green) on the basis of her age.

On appeal, Stevens argues that (1) the Commission should not have reversed the recommended decision and order of the administrative law judge (ALJ) because the complainant failed to establish age discrimination and (2) the Commission abused its discretion with respect to the damage award. We affirm and modify the Commission's order.

The hearing before the ALJ revealed that Stevens was an Illinois corporation engaged in the business of retail sales of women's apparel and accessories. For a number of years Stevens suffered decreased sales and profits such that the directors and officers implemented various merchandising and marketing strategies in order to make the company profitable. From 1982 until February of 1986, Bernard Zindler was the president and chief executive officer. In 1982, John

Edmondson held the office of general merchandise manager and in 1986 led a group which purchased Stevens in February 1986, at which time he became president and chief executive officer. On June 21, 1988, Stevens filed a petition in bankruptcy in the United States District Court for the Northern District of Illinois, and in March 1989, Stevens closed its stores.

Stevens hired Green in January 1961 and promoted her within the merchandising division from assistant buyer to buyer and in 1972 to divisional merchandise manager (DMM), the position she occupied until her discharge in November 1982. At the time of discharge, she was 61 years of age and earned $63,497.72 per year.

A divisional merchandise manager is responsible for a group of buyers in a particular division within the store and functions under the store's general manager. The general manager reports to the president. In 1974, Stevens appointed Green vice-president based upon her performance.

Green testified that she properly performed her duties. Green introduced her department's profit and loss reports, which showed a profit for each of the years from January 31, 1976, through January 31, 1981. The sales figures for the years January 31, 1977, through January 31, 1983, reveal a sales decline for Green's group, group 2, only during the year ending January 31, 1983, of 4.7%. Sales for groups 3 and 4 declined a greater amount during this period.

Stevens' evaluation of Green in April 1978 rated her performance good to very good in most categories and concluded that she "should prove to be most productive for many years in her current assignment."

Sue Dillon, a buyer reporting to Green for approximately five years until April 1982, testified that she received appropriate and good direction from Green and that Green implemented Zindler's policies.

On November 1, 1982, Zindler informed Green that she was to resign or be fired. Green refused to resign, and Zindler immediately terminated her employment. Don Johnson, age 38, replaced Green and began working on the same day.

Stevens' written personnel policies enumerate progressive disciplinary procedures that must be adhered to when an employee fails to meet job requirements. Specifically, the supervisor should first attempt to correct unacceptable behavior through counselling prior to issuing a written warning. The discussions are to be supported by documentation to the personnel director. The second step provides that the supervisor should conduct a warning interview and submit a

warning form signed by the employee and supervisor in the employee's file.

According to step three, a final warning must be given with the personnel director present and a mandatory listing of necessary action in order to improve behavior provided. In cases of involuntary separation, the final step requires notification to the personnel director of the intention to terminate and presentation of the mandatory written warning. Stevens did not follow any of the involuntary separation procedures in Green's case. Stevens failed to generate or place in Green's file any supporting written documentation. Neither Green's supervisor nor the personnel director participated in the termination process. No oral or written warnings of dismissal were given prior to her discharge.

According to Stevens, early in 1982, Zindler and Edmondson adopted a plan to redirect the business, reposition its market share and continue growth in a new marketing area. The major thrust of the reorganization consisted of switching from a "vendor oriented" to a "consumer oriented" approach as well as decreasing the number of DMMs to reduce costs. The plan emphasized the employment of individuals capable of applying the analytical, consumer-driven approach to merchandising.

Zindler afforded all of the DMMs, including Green, appropriate training and opportunities to learn and apply the new marketing approach. Zindler conducted a series of informational meetings during which he imparted the elements of the new strategy and the changes necessary for its implementation. Thereafter, Zindler replaced the DMMs who would not or could not accommodate the shift in market approach. By September 1986, three of the four original DMMs, including Green, were no longer in their positions. The remaining DMM was Rose Ann Cummins, who was 64 years old.

Zindler testified that he explained the new marketing approach to Green and concluded that she did not fully agree with the new approach. Zindler required that Green teach the buyers in her division the new approach and, in the summer of 1982, informed Green that the departments under her supervision were not performing well. According to Zindler, buyers trained by Green were not sufficiently analyzing their departments.

Stevens provided Green with outplacement counseling with Kinzer Corporation. As of April 1983, Green had submitted six employment inquiries during the six-month period. During the next 44 months, Green inquired about employment at the Apparel Center and distributed less than two resumes per month. In 1984, Green resigned from

a teaching position with the International Academy of Design.

On July 24, 1986, the Commission reversed the ALJ's recommended decision and order and remanded the case to the ALJ for a determination of damages. The ALJ determined that Green was entitled to back pay up to February 24, 1986, plus front pay through April 12, 1991, in addition to attorney fees. The Commission affirmed the order awarding damages.

■ On administrative review, this court is not to reweigh the evidence or determine the credibility of the witnesses. Rather, the function of the court is limited to ascertaining whether the final decision of the administrative agency is against the manifest weight of the evidence. (*Department of Corrections v. Adams* (1986), 146 Ill. App. 3d 173, 180, 496 N.E.2d 1138, 1143.) Thus, the issue before this court is whether the Commission's decision is against the manifest weight of the evidence.

■ When reviewing employment discrimination actions initiated pursuant to the Human Rights Act (Ill. Rev. Stat. 1985, ch. 68, par. 1—101 *et seq.*), this court utilizes the three-step analysis espoused by the Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. (*Adams*, 146 Ill. App. 3d at 181.) Under this approach, the complainant must first prove, by a preponderance of the evidence, a *prima facie* case of unlawful discrimination. This creates a rebuttable presumption that the employer unlawfully discriminated against the employee. After the submission of proof of the *prima facie* case of unlawful discrimination, the burden of persuasion shifts to the employer to clearly set forth a legitimate, nondiscriminatory reason for the employment decision. Then, the complainant must prove by a preponderance of the evidence that the reason proffered by the employer was pretextual. *Department of Corrections v. Adams* (1986), 146 Ill. App. 3d 173, 181, 496 N.E.2d 1138, 1144.

■ Green established a *prima facie* case of discrimination given the submission of evidence that she was a member of the protected class and was performing her responsibilities at a level which met Stevens' legitimate expectations. The division under Green's control and responsibility consistently generated profits from 1976 through 1981. Moreover, the division's sales were comparable to, if not greater than, the other divisions in 1977 through 1983. Stevens promoted Green to the position of vice-president. After Green's discharge, she was immediately replaced by a 38-year-old.

Stevens articulated as its legitimate, nondiscriminatory reason for Green's discharge, the reorganization plan to decrease the number of

DMMs and to employ individuals capable of applying the analytical, consumer-driven approach to merchandising. In addition, Zindler asserted that Green was not prepared during meetings to analytically discuss the department and did not sufficiently supervise and train the buyers in order to ensure that they analyzed their departments and were totally prepared.

Stevens discharged Green and Johnson replaced her in November 1982. Zindler testified that the department improved in 1983. However, Stevens discharged Johnson, Green's replacement, in November 1983, and Johnson's periodic evaluation revealed that the buyers under his direction were not properly motivated or challenged and that the buyers who were successful had accomplished their success through their own determination and high level of professionalism. Green trained three of the four buyers characterized as highly professional, determined and motivated.

At the time of hearing, two buyers who worked in Green's department were still employed by Stevens, and one of the former buyers, Sue Dillon, testified that she had received adequate and proper direction from Green.

Specifically, the Commission found:

"[T]he complainant had been a valued employee who had worked successfully for [Stevens] for approximately twenty-one years. She had been consistently promoted, and the complainant's exhibit 3 demonstrates a pattern of consistent increase of volume of sales within her department up until the time of her discharge. There was no evidence of any negative written evaluations. *** [T]here is further evidence of pretext in the failure of the respondent to present specific evidence regarding the way in which the complainant was failing to implement Zindler's new buying policy. Zindler stated that a consequence of a failure to follow the new buying philosophy would be the purchase of too many items from long time vendors which were not selling at the retail level. No evidence was produced by the respondent to show what purchases were made under the complainant's supervision which resulted in substantial monetary loss to the respondent. *** In fact, if the complainant's exhibit 3 is believed, the sales volume of the complainant's department was increasing."

■ Moreover, Stevens had a termination policy which required written warnings and meetings prior to termination. There was absolutely no effort to comply with any of the policy requirements. Accordingly, the Commission found the reasons articulated "unworthy of

belief," and that the "overwhelming weight of the evidence" supported the contention that the supposed performance problems articulated were merely a pretext for age discrimination and concluded that the respondent had not pursued the discharge in good faith. We conclude that the Commission's decision that Green proved by a preponderance of the evidence that the reasons articulated by Stevens were pretextual is amply supported by the record and not against the manifest weight of the evidence.

Next, Stevens argues that the Commission awarded damages far in excess of any possible injury Green may have suffered, stating that Green would not have remained in the service of Stevens after February 1986. In support thereof, Edmondson testified that lack of buyer competence is attributable to the DMM and that as of September 26, 1986, Stevens had terminated due to lack of competence the employment of six buyers who previously reported to Green. Edmondson further testified that as of February 1986, Stevens would have no longer employed Green. Thus, according to Stevens, back pay for any period after February 1986 and front pay through April 12, 1991, was clearly erroneous.

The record is void of any facts supporting Edmondson's assertion that Green would have been terminated in February 1986. Rather, the record indicates that Edmondson's assertions are speculative since he joined Stevens on November 22, 1982, as executive vice-president and general merchandise manager, subsequent to Green's discharge.

In November 1982, there were four DMMs. In January 1984, Edmondson became president of Stevens, and on February 24, 1986, he and others purchased Stevens' capital stock. After the February 1986 acquisition, one of the DMM positions was eliminated. Edmondson contended that Green would not have been one of the remaining three, but admitted that he had never worked with her and the extent of his knowledge regarding her capabilities was based upon what he had been told.

This testimony contradicts Edmondson's earlier statements that upon his arrival in 1982, he supervised at least three buyers who had been trained by Green and considered them competent and professional despite the shortcomings of their immediate supervisor, Green's successor. Green responded that while none of the buyers who were employed in 1982 were employed in 1986, there was no evidence presented as to why they left Stevens' employ.

■ The law requires that any uncertainty with respect to Green's continued employment be resolved in Green's favor because it is improper to resolve the uncertainty created by Stevens' unlawful dis-

crimination against the victim of the discrimination, especially where there is no factual basis for doing so. (*Clark v. Human Rights Comm'n* (1986), 141 Ill. App. 3d 178, 183, 490 N.E.2d 29, 33.) The burden is on the employer to demonstrate by a preponderance of the evidence that the employee would have been discharged for other causes. *Mt. Healthy City School District Board of Education v. Doyle* (1977), 429 U.S. 274, 50 L. Ed. 2d 471, 97 S. Ct. 568.

■■ Section 8—108 of the Illinois Human Rights Act provides in pertinent part that the Commission may provide for any relief to "make the individual complainant whole." (Ill. Rev. Stat. 1985, ch. 68, par. 8—108(J).) Front pay is a remedy available to compensate an individual who has been wronged by an employer's violation of the Age Discrimination in Employment Act, and it is appropriate to look to Federal decisions applying the parallel Federal law. (*City of Cairo v. Fair Employment Practices Comm'n* (1974), 21 Ill. App. 3d 358, 363, 315 N.E.2d 344, 348.) Front pay may be appropriate, especially when the plaintiff has no reasonable prospect of obtaining comparable employment. *McNeil v. Economics Laboratory, Inc.* (7th Cir. 1986), 800 F.2d 111, 118.

■■ Here, the Commission stated that "it would be sheer speculation to conclude that the Complainant would have been discharged after February of 1986, even if there had been no discrimination" and concluded that Stevens failed to make a strong enough showing to justify a cutoff of damages in February 1986. We see no reason to disturb this finding of the Commission and affirm the back pay award through February 24, 1986. We modify the front pay award and order that damages be computed up to and including March 1989, when Stevens closed its stores. Parenthetically, we note that reinstatement was not ordered because Stevens refused to rehire her.

■■ ■ In addition, Stevens asserts that Green's failure to make a reasonable effort to mitigate damages precluded an award of back pay. The complainant is required to take reasonable efforts in seeking subsequent employment. *Orzel v. City of Wauwatosa Fire Department* (7th Cir. 1983), 697 F.2d 743.

Specifically, Stevens argues that six employment inquiries during the first six months after termination and the circulation of 20 resumes and visits to 30 or 40 manufacturers or sales organizations within the Apparel Center over a 44-month period did not constitute reasonable efforts. Additionally, Stevens asserts that because Green resigned from a teaching position, the back pay award should be reduced by earnings Green would have received from that position. Stevens further contends that the back pay award should be reduced

so as to reflect Green's unavailability for seven to eight months and that the attorney fee award was improper.

Green was 61 years of age at the time of discharge, and a vice-president, divisional merchandise manager earning $63,497.72 per year. Subsequent to her discharge, Green participated in a career counselling program sponsored by Kinzer Corporation. The program, however, did not result in any employment opportunities for Green. In 1983, Green attended real estate classes and after obtaining a real estate sales license, worked for American Invesco Corporation from March through July 1983, earning a total of $355.

In 1983, Green worked four days a week, eight or nine hours a day, for Schwab, Taylor and Gavender as a merchandise manager consultant at an annual salary of $10,400. She continued to work for Schwab, Taylor and Gavender until May 1985, when she left to personally care for her mother since the cost of her care exceeded $8,000 a year.

While at Schwab, Taylor and Gavender, Green conferred with from 30 to 40 ladies' apparel manufacturers and/or sales organizations located in the Apparel Center regarding employment. While Green worked at Schwab, Taylor and Gavender, she worked part time in the morning at the International Academy of Merchandising, but discontinued teaching in 1984. During this period, from February 1983 through and including the hearing on damages, Green was registered with an employment agency. In February 1986, Green applied for an office manager position.

Stevens has the burden of proving that Green failed to mitigate her damages. (*People ex rel. Bourne v. Johnson* (1965), 32 Ill. 2d 324, 329, 205 N.E.2d 470, 473.) The Commission found that Stevens failed to meet that burden. That determination was not against the manifest weight of the evidence, and, therefore, we decline to overturn it.

Accordingly, we affirm the Commission's order, finding age discrimination and awarding back pay, front pay and attorney fees. We modify the front pay award and order that front pay shall terminate as of March 1989.

Affirmed and modified.

CERDA, P.J., and WHITE, J., concur.