NORTH SHORE SANITARY DISTRICT, Petitioner, v. ILLINOIS STATE
LABOR RELATIONS BOARD *et al.*, Respondents.

Second District   No. 2—93—0622

Opinion filed June 1, 1994.

Murphy, Smith & Polk, of Chicago (Karl W. Grabemann, of counsel), for petitioner.

Roland W. Burris, Attorney General, and Jacalyn J. Zimmerman, of Illinois State Labor Relations Board, both of Chicago (Rosalyn B. Kaplan, Solicitor General, and Susan Frederick Rhodes, Assistant Attorney General, of counsel), for respondent Illinois State Labor Relations Board.

Gilbert A. Cornfield and Mark S. Stein, both of Cornfield & Feldman, of Chicago (James M. Simpson, of counsel), for other respondents.

Joel D'Alba and Anne Wells Clark, both of Asher, Gittler, Greenfield, Cohen & D'Alba, Ltd., of Chicago, for *amicus curiae.*

JUSTICE PECCARELLI delivered the opinion of the court:
Petitioner, North Shore Sanitary District (District), seeks direct review of a decision and order of respondent, Illinois State Labor Relations Board (Board), finding that the District had violated sections 10(a)(1) and (a)(2) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(1), (a)(2) (West 1992)) by discharging certain union

employees in retaliation for protected union activities. In this court the District argues: (1) that the Board's decision that the District violated the Act is against the manifest weight of the evidence; (2) that the Board violated due process by refusing to order a hearing *de novo* after the substitution of hearing officers; and (3) that the Board abused its discretion in refusing to defer to those arbitration awards holding that certain of the discharges in question were with just cause.

The District provides waste water treatment in the eastern one-third of Lake County. Its facilities include sewage treatment plants in Waukegan, Gurnee, Highland Park (Clavey Road), and North Chicago; 10 pumping stations on the shores of Lake Michigan; and a landfill located just outside the northwest boundary of the District. The District is governed by a five-member board of trustees elected by the residents of the District. The District employs a general manager, who is responsible to the trustees for the overall administration of the District. The manager is assisted by an assistant general manager. The District is divided into five departments: operations, engineering services, maintenance services, administrative services, and laboratory services. Each department is supervised by a director who reports to the general manager or assistant general manager.

The employees at issue in the instant case, Frank Stefanick, Grover Finn, Frank Harscher, Floyd Traxler, Don Hansell, Willie Coleman, David Anderson, Clarence Ross, Joseph Costa, and Francisco Lopez, were members of a bargaining unit of approximately 100 employees represented by respondent, Service Employees International Union, Local No. 1-Eleven Division (the Union). The employees represented by the Union work in the operations and maintenance services departments and are assigned to work at one of the four sewage treatment plants or the landfill. The Union has represented these employees since 1970.

Since 1970, the District and the Union have entered into approximately 14 collective bargaining agreements specifying wages, hours, and other terms and conditions of employment of unit members. In April 1987 the parties began negotiating for a new agreement. At that time employees Stefanick, Harscher, Hansell, and Ross were members of the Union's strike committee. Employees Hansell and Costa were members of the negotiating committee. Stefanick, Hansell, and Ross were also members of a public works executive organizing committee composed of union members from numerous locals, including Local No. 1-Eleven.

The 1987 negotiations proved difficult. The primary dispute

occurred over wages. The Union sought a substantial wage increase, while the District sought wage concessions. The parties met six times between April and the end of June, but they made no movement from their original wage proposals. The parties proceeded to mediation, holding their first mediation meeting on July 28, 1987. Prior to the mediation meeting, Nick Belsanti, director of the Union's public works division, replaced the Union's chief negotiator, who was retiring. Unlike his predecessor, Belsanti was viewed by the District's negotiators as an aggressive and outspoken negotiator who "fired up" the Union membership during negotiations and employed measures never previously employed by the Union. He organized a strike committee and conducted meetings with unit employees to discuss strike plans and preparations.

Following the first mediation meeting, Belsanti wrote letters to the District's trustees, pointing out that the negotiations had reached an impasse and that the District's posture was "inflexible" and "overly aggressive." Belsanti requested that he be allowed to appear before the trustees at their next meeting on August 12, 1987.

The trustees denied Belsanti's request and criticized his attempt to negotiate directly with them rather than with the District's negotiating team as had been the practice since the onset of the bargaining relationship between the District and the Union. Nevertheless, on August 12 Belsanti, accompanied by other Union members including Stefanick and Ross, appeared uninvited at the trustees' meeting. Bill Byers, the District's general manager, and Gene Lukasik, the assistant general manager, also attended the meeting. Belsanti addressed the trustees, accusing the District's negotiators of stonewalling and taking an unfair position. Belsanti urged the trustees to meet with him in executive session to discuss collective bargaining matters. The trustees declined and reasserted their position that they would negotiate only through their negotiators. Belsanti reported back to the Union membership that they should continue with strike preparations.

On August 19, 1987, the District's chief negotiator wrote Belsanti a letter, accusing Belsanti of blatantly violating the Illinois Public Labor Relations Act by attempting to circumvent the District's negotiating team and deal directly with the trustees. The District's chief negotiator warned that further attempts would prompt the District to file unfair labor practice charges with the Board.

Later in the month, Belsanti again appeared at a trustees meeting accompanied by 65 or 70 employees and their families. Prior to the meeting, the employees picketed in front of the District's headquarters. Byers, Lukasik, and the District's chief negotiator were also present at this meeting.

On August 24 the parties met in mediation. The meeting ended without any agreement. The next day Belsanti sent written notice to the trustees of the Union's intent to strike. This was the first time in the history of the parties' collective bargaining relationship that the Union formally notified the District of its intent to strike. The Union set a strike deadline of September 11, 1987. On August 28, the District responded by sending a letter from its general manager, Byers, to all bargaining unit employees informing them that if a strike occurred, the District would continue to function and would not seek to have the strike enjoined. The District warned:

> "There will be payless paydays—perhaps *lots* of them. There will be no life, medical and dental insurance paid for you by the District. You could even be *out of a job* if the District permanently replaces you with a new employee!" (Emphasis in original.)

On the morning of September 11, the day the Union's strike was scheduled to begin, the Union and the District met in mediation. Also, on that date, Union employees in the unit began arriving at their respective work sites, cleaning out their lockers and gathering personal belongings in preparation for the strike. Each had brought a picket sign with him. Around 1 p.m., the parties reached an agreement in mediation, and the Union called off the planned strike. After reaching the agreement, Belsanti approached the District's negotiators to meet with them, but they turned around and walked away from him. The agreement was ratified by the Union in November 1987.

The discipline and discharges, which are the subject of the instant petition for review, occurred over a two-year period beginning almost immediately after the conclusion of the 1987 negotiations. In 1988, the District discharged 10 unit employees, or 10% of the bargaining unit represented by the Union. In January alone, four unit employees were discharged as compared to four employees in all of 1986, none in 1987, two in 1989, and two in 1990.

All the employees terminated were open Union adherents, with the exception of two employees who were discharged along with Union adherents. Frank Stefanick was a member of the Union's strike committee and a strike captain at the District's Waukegan plant during the 1987 negotiations. Also, he accompanied Belsanti to the trustees' meeting on August 12, 1987. Frank Harscher was a member of the Union's organizing and recruitment committees, a member of the Union's strike committee, and a strike captain at the North Chicago plant during the 1987 negotiations. Floyd Traxler was a member of the Union's organizing and recruitment committees.

Dan Hansell was a member of the Union's negotiating and strike

committees in 1987 and also was a strike captain at the Waukegan plant. Clarence Ross was a member of the Union's strike committee in 1987 and a strike captain at the District's Gurnee plant. Additionally, he had filed a safety grievance just prior to his discharge. Joseph Costa was a member of the Union's negotiating committee in 1987, and Francisco Lopez was a member of the Union's strike and recruitment committees at that time. Also, Lopez had testified in the instant case, on behalf of the Union, before his discharge. Willie Coleman had reported antiunion employees to the police for weapons violations.

Grover Finn and David Anderson were not Union activists. However, Finn was discharged along with Stefanick, and Anderson was discharged along with Coleman.

Except for Coleman, all of the Union activists discharged by the District had very long work records at the District. Stefanick had been hired in 1980, Harscher and Traxler in 1975, Hansell in 1981, Ross and Costa in 1974, and Lopez in 1979. All the men had good records. Only one of them, Stefanick, had ever previously been suspended for any reason.

In their 13 years with the District, Harscher and Traxler had received a warning letter, issued to both in October 1987 and subsequent to the threatened strike, concerning a failure to clean properly. Ross had received a warning letter dated June 1988, regarding improper attitude towards supervisory personnel and improper equipment start-up procedure. Hansell had received a warning letter, dated February 1987, regarding his failure to wear a respiratory mask as prescribed by his doctor. Coleman had received a warning letter in July 1987, accusing him of wasting time on the job. Costa and Lopez had no record of any prior discipline received.

The District set forth various reasons for the discharges of these employees. It accused Stefanick and Finn of watching television in the lunchroom, an alleged violation of District rules. The District accused Harscher and Traxler of secretly swapping time with each other so that Harscher worked the end of Traxler's shift as well as his own but punched out Traxler's time card to indicate that Traxler had completed his shift. The District discharged Hansell for volunteering to retrieve a stranded district truck although he did not have the requisite license to drive that truck and had not obtained permission to leave the plant. The District discharged Coleman and Anderson for allegedly sleeping while on duty and failing to perform their assigned cleaning duties. It discharged Ross for "doubling up" waste water samples rather than taking a smaller sample each hour, an alleged violation of District rules, and for refusing to train a

nonunion employee. The District accused Costa of allegedly falsifying records by filling in a report of inspection before the inspection had actually been made. It also accused Lopez of falsifying records by filling out a sample record one hour before he was supposed to take a reading.

The Union filed unfair labor practice charges with the Board on February 5, 1988, and June 1, 1989, alleging that the District's discipline and discharge actions were motivated by antiunion animus, in particular, by the District's intent to retaliate against the Union and its supporters for the Union's activities in connection with the 1987 negotiations. The Union filed separate grievances pursuant to the parties' collective bargaining agreement, challenging the discharges of certain Union employees. With the exception of the discharge of Stefanick, the arbitrators found that "just cause," under the terms of the agreement, existed for the discharge of employees Harscher, Traxler, Hansell, Ross, and Costa. The discharges of Finn (a probationary employee), Coleman, Anderson, and Lopez were not arbitrated. None of the arbitrators heard evidence of the other discharges occurring within the bargaining unit. None was presented with or considered evidence of the 1987 negotiations and strike preparations and the role they may have played in the District's discharge decisions.

Hearing officer Nancy Fertig conducted hearings on behalf of the Board on the unfair labor practice charges during November 1988 to May 1989. While the parties were before hearing officer Fertig, they stipulated to the admission of evidentiary transcripts and exhibits from the arbitration proceedings concerning the discharges of the Union employees. The parties also agreed to strike the testimony of witnesses who had already testified before Fertig regarding these discharges.

The proceedings before hearing officer Fertig were delayed for over a year until August 1990 while the Board awaited the outcome on an administrative subpoena enforcement action brought by it to compel the District to produce certain disciplinary records of its non-bargaining unit employees. By the time the appellate court affirmed the circuit court's order granting the enforcement of the subpoena, hearing officer Fertig had resigned from her position, and the case was reassigned to hearing officer Robert Costello. At the time Costello began holding hearings, the Union had not yet completed its case, and the District had not begun its case.

Hearing officer Costello found that Finn, Stefanick, Harscher, Traxler, Hansell, Coleman, Anderson, Ross, Costa, and Lopez were discharged in violation of sections 10(a)(1) and (a)(2) of the Act. The

hearing officer noted that none of the employees received the benefit of progressive discipline and that all were terminated for conduct for which nonunion employees received no discipline. Hearing officer Costello ordered the District to offer the discharged employees full reinstatement with back pay and interest. The District filed timely exceptions to the hearing officer's decision.

Subsequently, after hearing the oral arguments of the parties and reviewing the record in the case, the Board reached the same conclusion as hearing officer Costello. The Board noted the number of long-term Union employees that the District discharged without warning or other progressive discipline subsequent to the 1987 contract negotiations and found that, but for the Union's activities in 1987, the employees would not have been discharged for their misconduct. The Board determined that the District had engaged in a pattern of discriminatory conduct in retaliation for Union activities and, therefore, violated sections 10(a)(1) and (a)(2) of the Act when it discharged the employees at issue. The District filed a timely petition for review.

■ Initially, we address the Board's challenge that the District's statement of facts in its original brief does not comply with Supreme Court Rule 341(e) (157 Ill. 2d R. 341(e)) because it contains argumentative as well as inaccurate and inappropriate comments. Supreme Court Rule 341(e)(6) clearly sets forth that the facts in the appellant's "Statement of Facts" must be stated "accurately and fairly without argument or comment." (157 Ill. 2d R. 341(e)(6).) We agree with the Board that portions of the District's brief do not comply with this rule. Accordingly, we will disregard any noncomplying statements or comments.

The District first contends that the Board's decision that the District violated the Act by discharging the employees at issue in retaliation for protected Union activities is against the manifest weight of the evidence. The District asserts that the Board ignored evidence in support of the District's position that the discharges were for just cause.

On administrative review, the sole function of the reviewing court is to ascertain whether the final decision of the administrative agency is against the manifest weight of the evidence. (*Charles A. Stevens & Co. v. Human Rights Comm'n* (1990), 196 Ill. App. 3d 748, 753.) An agency's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. (*Village of Wheeling v. Illinois State Labor Relations Board* (1988), 170 Ill. App. 3d 934, 940.) Where it appears that evidence exists to support the administrative findings, a reviewing court will not substitute its

judgment for that of the agency, and the findings should be affirmed. *Wilson v. Department of Employment Security* (1990), 196 Ill. App. 3d 711, 713.

■ Where an employer has been charged with an unfair labor practice for discharging an employee based upon the employee's union activity, the charging party must show by a preponderance of the evidence that the discharge was motivated by the employer's antiunion animus. (*City of Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335, 345.) Since motive is a question of fact, the Board's finding must be accepted if supported by substantial evidence, and the Board may infer discriminatory motivation from either direct or circumstantial evidence. (128 Ill. 2d at 345.) The Board may reasonably infer antiunion motivation from such factors as:

> "an employer's expressed hostility towards unionization, together with knowledge of the employee's union activities [citation], proximity in time between the employees' union activities and their discharge [citation], disparate treatment of employees or a pattern of conduct which targets union supporters for adverse employment action [citations], inconsistencies between the proffered reason for discharge and other actions of the employer [citation], and shifting explanations for the discharge [citations]." 128 Ill. 2d at 346.

Once the charging party has established a case of discharge based in part on antiunion animus, the employer must show that the discharge was based on legitimate business reasons. (*City of Burbank*, 128 Ill. 2d at 346.) Merely proffering a legitimate business reason for the adverse employment action does not end the inquiry, for the reasons proposed must be *bona fide* and not based on pretext. (128 Ill. 2d at 346.) If the proposed reasons constitute a "mere litigation figment" or were not relied upon, then the determination of pretext ends the inquiry. (128 Ill. 2d at 346.) However, where the employer proposed legitimate business reasons for the discharge and is found to have relied upon them in part, then the case is one of "dual motive," and the employer must demonstrate by a preponderance of the evidence that the employee would have been terminated despite his union involvement. 128 Ill. 2d at 346-47.

■ To establish a *prima facie* case of an unfair labor practice under sections 10(a)(1) and (a)(2) of the Act, the Union in the instant action had to prove: (1) that the employees in question were engaged in union activity; (2) that the District had knowledge of the activity; (3) that the District harbored an antiunion animus; and (4) that the adverse employment action was taken under suspicious circumstances. (*Rockford Metropolitan Exposition Auditorium & Office*

*Building Authority v. Illinois State Labor Relations Board* (1992), 224 Ill. App. 3d 1007, 1016.) Here, the Union met all four requirements.

The evidence presented at the hearing established that with the exception of Finn, a probationary employee, and possibly Anderson, the employees in question were Union members in 1987. Most were actively engaged in Union activity, and the District had knowledge of that fact, as discussed below.

It is undisputed that the 1987 negotiations between the District and the Union were extremely difficult. The primary dispute concerned wages, with the Union seeking a substantial wage increase and the District seeking wage concessions. During the negotiations, the Union's chief negotiator, Belsanti, "fired up" the Union membership, organizing a strike committee and conducting meetings to discuss strike plans and operations. Because the parties had reached an impasse, they proceeded to mediation.

Following the first mediation meeting, Belsanti, in an unprecedented move, wrote to the District's trustees and later appeared at the trustees' meeting in an attempt to deal directly with them instead of with the District's "inflexible" negotiating team. The District through a letter from the president of the trustees and a letter from its chief negotiator expressed its displeasure with Belsanti's divergence from the past negotiating practices of the parties. Belsanti subsequently appeared at another trustees' meeting, accompanied by Union employees and their families. Before the meeting, the employees picketed in front of the District's headquarters. The District's general manager, Bill Byers, assistant general manager, Gene Lukasik, and chief negotiator were present at the meeting.

At the time of the negotiations Stefanick, Harscher, Hansell, and Ross were members of the Union's strike committee. Additionally, both Stefanick and Hansell were strike captains at the Waukegan plant, Harscher was strike captain at the North Chicago plant, and Ross was strike captain at the Gurnee plant. Also, Ross was one of the Union members who accompanied Belsanti to the trustees' meeting. Hansell and Costa were members of the negotiating committee. Both Harscher and Traxler were members of the Union's organizing and recruitment committees.

The District contends that the Board erred in finding that it had knowledge of the discharged employees' Union activity. Yet, the District admits in its brief that it was aware, at the very least, of the activity of Ross, who accompanied Belsanti to the trustees' meeting, and of Costa, who was a member of the Union's negotiating committee. As the evidence showed that Hansell was also a member

of the negotiating committee, it can be presumed that his activities were also known to the District. Nonetheless, where the employer's entire pattern of conduct bespeaks an attempt to thwart Union activity or where the vast majority of the discharged employees were Union sympathizers, a finding of unlawful motivation for the discharges does not depend on the employer's knowledge that each of the discharged employees was engaged in Union activity. *Rockford Township Highway Department v. Illinois State Labor Relations Board* (1987), 153 Ill. App. 3d 863, 881.

Here, the District's pattern of conduct in discharging the 10 employees in question, eight of whom were active Union supporters, reflects that it was engaged in a pattern of disciplining Union employees in retaliation for their Union activity. The evidence presented to the hearing officer and the Board in the nature of the proximity in time between the employees' Union activities and their discharges, the disparate treatment of the Union employees compared to other nonunion employees, and the District's proffered reasons for the discharges of the employees in question established that the discharges were based in part on antiunion animus and that they occurred under suspicious circumstances. This same evidence supported the Board's finding that none of the 10 discharged employees would have been discharged absent the animus.

Following the bitter 1987 collective bargaining agreement negotiations and the subsequent signing of that agreement in November 1987, the number of discharges increased substantially. In 1988, 10 employees were discharged as compared to zero in 1987, four in 1986, two in 1989, and two in 1990. Of the 10 discharged in 1988, eight were Union members and two, Finn and Anderson, were discharged along with Union members. In January 1988, alone, four Union activists, Stefanick, Harscher, Traxler, and Hansell, were terminated. These January discharges, as the Union points out in its brief, equalled the total number of discharges in 1986 and more than the discharges occurring in 1987, 1989, or 1990. Additionally, the ratio of discharges to warnings issued in 1988 was substantially greater than in 1986, 1987, 1989, or 1990.

The District presented statistical evidence to show that the disparity in the number of discharges in 1988 as compared to the years surrounding 1988 was not significant. The Board, however, rejected that statistical evidence, finding that the evidence was based on a comparison of years 1986-90, 1987-90, and 1988-90. As all of the years analyzed included the year 1988, when the number of discharges rose substantially, as opposed to analyzing the number of discharges occurring in 1987 with 1988, or in 1988 with 1989 or 1990,

the Board found the statistical analysis nonpersuasive. We agree with the Board's conclusion. Because this statistical analysis was the only evidence the District presented for the increase in discharges in 1988, we accept the Board's determination that the increase in disciplinary action occurring shortly after the threatened 1987 strike raised an inference of antiunion animus.

For the most part, the discharged Union activists constituted employees who had worked for the District for a long time and had good records. Ross and Costa were hired in 1974, Harscher and Traxler in 1975, Lopez in 1979, Stefanick in 1980, and Hansell in 1981. Coleman began working in 1987.

Despite general manager Byers' testimony that the District adhered to a policy of progressive discipline, the employees in question had received no discipline or essentially none prior to their discharges. Of the discharged Union activists only one of them, Stefanick, had ever been previously suspended for any reason. Harscher, Traxler, Hansell, Coleman, and Ross had each received a warning letter regarding relatively minor misconduct. Both Costa and Lopez had received no prior discipline. That most of the employees at issue had long records of good service was a factor the Board could consider to infer retaliatory animus. *Fox-Art Theatres, Inc.* (1986), 278 N.L.R.B. 812.

Moreover, the circumstances surrounding the discharges were suspicious and revealed that the reasons the District proffered for the discharges were neither legitimate nor sufficient to disprove that the employees in question were subjected to disparate treatment. Stefanick and Finn allegedly violated District rules by watching television in the lunchroom of the Waukegan plant. Yet, no written rule prohibiting employees from watching television in the lunchroom existed. In fact, evidence to disprove this point was presented in the form of a 1972 memorandum stating that televisions could be used during breaks and lunch periods. The District presented no evidence to show that this memorandum had ever been rescinded. At the time Stefanick and Finn were watching television, Stefanick was writing entries into his logbook and heating soup on a burner located at the back of the lunchroom. Dennis Mateja, the assistant plant superintendent who accused Stefanick of violating a District rule pertaining to television viewing, never asked Stefanick if he was on his lunch break, how long Stefanick had been in the lunchroom, or whether Stefanick had completed his work tasks. Nevertheless, Stefanick was terminated for watching television in the lunchroom.

The evidence established that no other employees had ever been terminated for watching television in the lunchroom during working hours. The only evidence of disciplinary action taken in this regard

was the suspension of an employee in 1977 for watching television while working on the job. Furthermore, testimony was presented that on another occasion management observed an employee sleeping in front of a television set in a lunchroom, yet took no disciplinary action. Based on the disparate treatment of Stefanick, we agree with the Board that the District's real motive for discharging him was its antiunion animus.

As to Finn, the District presented no evidence to show he would have been discharged in the absence of Stefanick's involvement in the television incident. Rather, his discharge appeared to result from the District's attempt to mask its unlawful discharge of Stefanick. Discriminating against an employee for purposes of covering up discrimination against another employee constitutes a violation of sections 10(a)(1) and (a)(2) of the Act. (See *Howard Johnson Co.* (1974), 209 N.L.R.B. 1122.) We conclude that the District's discharge of Finn was discriminatory.

The District terminated Harscher and Traxler for swapping time with each other so that Harscher worked the end of Traxler's shift in addition to his own succeeding shift but "punched out" Traxler's time card to indicate that Traxler had completed his shift. Traxler had left work 15 to 30 minutes early because his wife was scheduled for surgery the next morning.

The evidence showed that a District rule existed prohibiting the punching out of an employee's card by another. Nevertheless, in 1986, an employee named Callahan had been given only a three-day suspension, later rescinded by general manager Byers, for having his time card punched on multiple occasions by another employee. We agree with the Board that Byers' reason for the rescission of Callahan's suspension, *i.e.*, that the District lacked proof that Callahan knew his time card was being punched, was "simply implausible," especially in light of the fact that another District witness testified that Callahan had arrived at work on several occasions to discover he had already been punched in. Furthermore, although Byers testified that Paterson, the employee who had been punching in Callahan, had been terminated for his conduct, the District's discharge records for 1986, which ostensibly contained all the disciplinary actions taken in 1986, did not contain any documentation to support Byers' testimony.

Also, testimony by Byers that the District discharged two other employees for the same offense was not supported by the record. One of the employees was reinstated in an arbitration proceeding, and the other employee was discharged for a different reason, *i.e.*, leaving his work station without authorization. We conclude, as did the Board, that the termination of Harscher and Traxler, long-term employees

with good work records, for an incident which resulted in no loss of work to the District was unjustified and was motivated by the District's antiunion animus.

The District discharged Hansell for leaving the Waukegan plant without permission to accompany a co-worker to a nearby landfill to retrieve a stranded District truck although he did not possess the requisite license to drive the truck. In discharging Hansell, as the Board points out, the District not only failed to adhere to its progressive discipline policy but also treated Hansell more severely than other employees who had engaged in similar conduct. The record reflects that several employees who left their work sites without authorization, as did Hansell, received only suspensions. For example, in one instance, the District issued a one-day suspension to an employee for leaving his work site without permission to have his picture taken for a licensing exam. In another instance, an automotive maintenance superintendent received only a warning letter for allowing an employee to operate a District dump truck on two occasions without an appropriate license. Given the District's past treatment of employees committing offenses similar to Hansell's, we find that, but for his Union activity, Hansell would not have been discharged by the District.

The District terminated Coleman and Anderson for allegedly sleeping while on duty and failing to perform their assigned cleaning duties, essentially minor misconduct. Coleman denied at the hearing that Anderson and he were sleeping, and the supervisor who discovered them in a closed room talking and drinking coffee testified that he had not actually seen them sleeping. Even had they been sleeping, however, the evidence showed that the District subjected them to discriminatory treatment when it fired them. Other employees who had been found sleeping on the job had not been discharged, or, in the case of one employee discovered sleeping in front of a television, even disciplined.

Although no evidence existed that Anderson was a Union member, Coleman was a member of the Union. Because the District offered no explanation at the hearing for failing to adhere to the progressive discipline policy which it stressed it followed, we conclude that the District failed to prove that Coleman and Anderson would have been terminated absent the District's antiunion feelings.

The District's discriminatory treatment of Union members was particularly apparent in its discharges of long-time employees Ross, Costa, and Lopez, all of whom were terminated for falsification of sample results. Ross allegedly "doubled up" waste water samples rather than taking a small sample each hour. He also was accused of

refusing to train a nonunion employee. Costa allegedly falsified records by filing a report of inspection before the inspection had actually been made, and Lopez for allegedly filling out a sample record one hour prior to the time he was to take a reading.

It was the District's position at the hearing, as here, that falsifying samples and records necessitated immediate termination. Indeed, the record reflects that the District had, in the past, terminated employees for falsifying records. However, the record also reveals that eight months prior to the discharge of Ross, the first of the three discharges at issue, Lopez provided the District with concrete proof that two nonunion employees on his shift had failed to perform their rounds as scheduled and had falsified their reports. Yet, the District took no action against these employees.

One of these two nonunion employees, Terry Jarrett, was part of an antiunion faction during the period surrounding the 1987 negotiations. Conversely, Ross, Costa, and Lopez were active and very visible Union supporters during the negotiations. Ross was a member of the strike committee and was one of the employees who accompanied Belsanti to the trustees' meeting. Costa was a member of the Union's negotiating committee. Lopez testified on behalf of the Union before his discharge. The evidence of the District's disparate treatment of these Union activists by terminating them for an offense for which antiunion supporters were not even disciplined justified the Board's finding that the District's motive in firing Ross, Costa, and Lopez was to get rid of employees who actively supported the Union in 1987. We note that the discharges occurred sometime after the 1987 negotiations, *i.e.*, Ross in December 1988 and Costa and Lopez in January 1990. However, timing is but one factor in analyzing an employer's motive in discharging an employee. *City of Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335, 346.

■ We conclude that a *prima facie* case of discrimination in the discharges of Stefanick, Finn, Harscher, Traxler, Hansell, Coleman, Anderson, Ross, Costa, and Lopez was established. While the District did advance legitimate business reasons for the discharges, it did not show by a preponderance of the evidence that the discharges would have occurred despite the employees' union involvement. Rather, the District's failure to apply its policy of progressive discipline in dealing with the employees in question and its disparate treatment of other employees guilty of the same misconduct as the discharged employees supports the Board's view that the discharges were discriminatory.

■ On review, the District also contends that the Board violated due process by refusing a hearing *de novo* after the substitution of

hearing officers. We, however, believe that the District's position is without merit.

In the instant case, hearing officer Fertig held all the hearings in 1988 and 1989. The proceedings before her were then delayed for over a year until August 1990 while the Board awaited the outcome on an administrative subpoena enforcement action brought by it to compel the District to produce certain disciplinary records of its non-bargaining employees. By the time the appellate court affirmed the circuit court's order granting the enforcement of the subpoena, hearing officer Fertig had resigned from her position, and hearing officer Costello had been assigned to replace her. The District maintains that the person hearing the testimony at the prior hearings should be the same person resolving the credibility of that testimony. Because hearing officer Costello did not hear or see any of the witnesses who testified in the arbitration hearings or prior to the substitution of hearing officers, the District claims its right to due process was denied when Costello resolved the issue of the credibility of these witnesses.

Initially, we agree with the Union's position that the District has no right to complain about the substitution of hearing officers since the substitution resulted from the District's own conduct. The District's resistance to the Board's subpoena to compel production of the disciplinary records of nonbargaining employees caused a one-year delay in the proceedings. Had the delay not occurred, hearing officer Fertig may very well have issued a recommended decision before resigning.

Nonetheless, our supreme court has held that, in the absence of statutory provisions to the contrary:

> " '[I]t is not necessary that testimony in administrative proceedings be taken before the same officers who have the ultimate decision-making authority. [Citations.] *** [A]dministrative proceedings may be conducted by hearing officers who refer the case for final determination to a board which has not "heard" the evidence in person. The requirements of due process are met if the decision-making board considers the evidence contained in the report of proceedings before the hearing officer and bases its determination thereon. [Citations.]' " (*Starkey v. Civil Service Comm'n* (1983), 97 Ill. 2d 91, 100, quoting *Homefinders, Inc. v. City of Evanston* (1976), 65 Ill. 2d 115, 128.)

As the requirements of procedural due process are met under these circumstances, we conclude that those requirements are also met when a substituting hearing officer bases his decision not only on the evidence presented before him but also on the evidence contained in

the report of proceedings before a prior hearing officer. Thus, the fact that hearing officer Costello, rather than hearing officer Fertig, made the ultimate recommended decision is inconsequential.

Moreover, the record shows that prior to hearing officer Costello's assignment to the case the parties stipulated to the substitution of the arbitration transcripts for the live testimony that had been heard by hearing officer Fertig. Therefore, all the evidence pertaining to the circumstances surrounding the alleged discharges consisted of transcripts from the arbitration hearings held in connection with the discharges rather than live testimony. As Costello pointed out in his recommended decision, once a large portion of the earlier testimony was struck by means of the stipulation, little, if any, material testimony raising substantial issues of credibility was left. The record supports the hearing officer's conclusion.

Unlike the Union, the District was able to put on its entire case, consisting of live testimony, before hearing officer Costello. Although the hearing officer heard this live testimony, he apparently found the District's witnesses, primarily Byers, the District's general manager, and Jerry Myers, the District's director of operations, the two officers most responsible for the discharges at issue, less than credible. Regarding Byers, Costello commented, "Byers proved throughout his testimony in this case to be a witness of convenient memory who often gave evasive answers." Also, the hearing officer's comments regarding Myers' claim that Ross, Costa, and Lopez falsified samples indicated that he found Myers' testimony less than credible in that regard.

Where credibility is a determining factor in a case, the presiding hearing officer must participate in the decision. (*Quincy Country Club v. Human Rights Comm'n* (1986), 147 Ill. App. 3d 497, 500.) Contrary to the District's position, that is what occurred here. Hearing officer Costello presided over most of the hearing, that is, a portion of the Union's case and *all* of the District's case. The live witnesses he heard were the District's witnesses. The testimony the District claims he should have heard was stricken by agreement of the parties before the prior hearing officer, Fertig, and was substituted with arbitration transcripts. Given all these circumstances, we find the District's claim that it was somehow denied due process because the Board refused to grant a *de novo* hearing, when one hearing officer resigned and another replaced her, to be totally without merit. In our view, the motion for a *de novo* hearing constituted a mere attempt by the District to delay the instant proceedings even further than it already had.

■ The District also claims that the Board abused its discretion in refusing to defer to those arbitration awards holding that certain of

the discharges in question were with just cause. Besides filing unfair labor practice charges with the Board, the Union filed separate grievances for arbitration, pursuant to the parties' collective bargaining agreement, challenging the discharges of Stefanick, Harscher, Traxler, Hansell, Ross, and Costa. The arbitrators found that, with the exception of Stefanick, just cause existed under the terms of the agreement to discharge the employees. The District maintains that the hearing officers should have deferred to these arbitration awards.

Post-arbitral deferral, *i.e.*, deferring to the arbitrator's grievance resolution, is improper when the arbitrator's decision has not made a factual finding with regard to a crucial allegation of the Union's unfair labor practice charge. (*Water Pipe Extension v. City of Chicago* (1990), 206 Ill. App. 3d 63, 67.) Here, the record reveals that the instant dispute was neither submitted to nor resolved in the grievance arbitration proceedings. The arbitrators never considered whether the District's discipline and discharge actions were motivated by antiunion animus or were in retaliation for protected activities occurring during the course of the difficult and extended 1987 negotiations. As the Board pointed out in its decision and order:

> "No arbitrator was presented with evidence of the Union activities and/or proclivities of the employee involved. No arbitrator heard evidence concerning the relations between the parties during the 1987 negotiations. No arbitrator was made aware of the drastic increase in discharges immediately on the heels of the 1987 negotiations. And, no arbitrator was presented with or resolved the question of whether was [*sic*] any relationship existed between protected Union activities and the discharges at issue. In short, no arbitrator considered the 'pattern of discrimination' evidence which is the heart of this case."

Rather, each of the individual arbitrations was limited solely to the contract question of whether the District had just cause to discharge the employee based upon a particular isolated set of facts. None of the arbitral decisions addressed or considered the pattern of retaliation which was the subject of the unfair labor charges before the Board. Under these particular circumstances, deferral to the arbitrators' decisions would have been inappropriate. Therefore, the Board's refusal to defer to those decisions did not constitute an abuse of discretion.

Finally, we note that we agree with the Union that the District's disparaging remarks directed against the Board and hearing officer Costello throughout the District's briefs are unwarranted and, in our view, are both offensive and unprofessional. Such remarks serve no purpose except to imply that the party making the remarks has no case.

We conclude that where, as here, evidence exists to support the Board's findings, those findings should be affirmed. Accordingly, the decision of the Illinois State Labor Relations Board is affirmed.

Affirmed.

QUETSCH and COLWELL, JJ., concur.