THE DEPARTMENT OF CORRECTIONS, Plaintiff-Appellee, v. LEROY ADAMS *et al.*, Defendants-Appellants.

First District (4th Division) No. 85—1727

Opinion filed July 24, 1986.

174

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and James P. Nally, Assistant Attorney General, both of Chicago, of counsel), for appellant State of Illinois Human Rights Commission.

Murray & Girard, Ltd., of Chicago (Michael J. Murray and Richard E. Girard, of counsel), for appellant Leroy Adams.

Stratton, Nardulli & Lestikow, of Springfield (Steven Nardulli, of counsel), for appellee.

PRESIDING JUSTICE LINN delivered the opinion of the court:

Complainant, Leroy Adams (Adams), and the Human Rights Commission (Commission) appeal from an order of the circuit court of Cook County reversing a final administrative decision by the Commission. The Commission's decision held that the Department of Corrections (Corrections) racially discriminated against Adams when Corrections failed to promote Adams. to the position of Activity Program Supervisor of Stateville Correctional Center (Stateville).

On appeal, both Adams and the Commission contend that the circuit court failed to apply the proper standard of review of the Commission's decision. In addition, Adams contends that the Commission's decision that Corrections discriminated against him was *not* against the manifest weight of the evidence, but that the Commission's decision that Adams was not constructively discharged by Corrections where he was refused promotion to the position of Activity Program Supervisor a second time *was* against the manifest weight of the evidence.

We reverse the decision of the circuit court of Cook County on the issue of discrimination, and remand the issue of constructive discharge for further proceedings consistent with this opinion.

BACKGROUND:

On June 12, 1981, Adams, a black man, filed with the Department

of Human Rights (Department) a complaint alleging employment discrimination. Adams alleged that because of his race Corrections denied him a promotion, and that Greg Pattison, a less qualified white applicant, was given the position of Activity Program Supervisor at Stateville instead of Adams. Upon investigation of the charge, the Department filed with the Commission a civil rights action pursuant to the provisions of the Illinois Human Rights Act (Act) (Ill. Rev. State. 1983, ch. 68, par. 1—101 *et seq.*). Corrections defended the claim asserting that it selected the better qualified candidate without regard to race.

The Commission appointed an administrative law judge to convene a hearing to determine the factual questions regarding Adams' claim. The administrative law judge held that Corrections had indeed hired the better qualified candidate and filed with the Commission a recommended order that Adams' complaint be dismissed. The Commission reviewed the administrative law judge's recommendation, finding it to be against the manifest weight of the evidence, and that the reasons cited by Corrections for. not promoting Adams were pretextual, rather than the true reasons.

The undisputed facts of this case are as follow. In June 1980, the position of Activity Program Supervisor at Stateville became available when the Activity Program Supervisor, Jessie Vail (Vail), left Corrections. The only two applicants for Vail's position were Adams, a black man, then employed by Corrections, and Pattison, a white man. Both men received a grade of "A" on the competitive promotional examination administered by the Department of Personnel.

ADAMS' QUALIFICATIONS

Adams was first employed by Corrections on August 1, 1967. At that time, he was assigned to the Sheridan Industrial School for Boys as an educator. In March 1969, he was transferred to the Illinois Youth Center at Joliet where he worked as a physical-education instructor and coordinated physical therapy. In June 1974, Adams was transferred to Stateville, where he was assigned to the leisure-time–activities department under the immediate supervision of then Activity Program Supervisor, Vail. Adams occasionally acted as Activity Program Supervisor when Vail was absent, and his performance evaluation for the period from August 1, 1976, to May 15, 1978, stated:

> "Leroy Adams has developed into one of the top Leisure Time Activity persons in the State. He has a great ability to lead residents in group activity. He has done an excellent job coaching the institution basketball team. Mr. Adams has demonstrated

the ability to assume a superior role."

Adams attended Langston University in Langston, Oklahoma, and received a bachelor of science degree in agriculture in 1964. He completed six hours of post-graduate work in education at the National College of Education in Evanston, Illinois, in 1968. In 1972, he completed several hours of education and drivers-education courses at Chicago State University in Chicago. In 1973, he completed two courses in criminology at Northern Illinois University in De Kalb, Illinois. In 1979-1981, he completed 15 hours of leisure-time-service courses at Governor's State University in Park Forest South, Illinois.

## PATTISON'S QUALIFICATIONS

Pattison was educated at Illinois State University where he earned a bachelors degree and a masters degree in health, physical education, and recreation. His work experience included two years as a recreational worker responsible for programming sports and physical activities at Pontiac (Illinois) Correctional Center, a maximum-security center under the direction of Corrections. While there, Pattison introduced music and passive leisure activities into the activity program. In addition, for nearly four years Pattison coordinated leisure activities for five prerelease correctional centers as Recreation Director for Community Corrections—Milwaukee (Wisconsin) Region. Immediately prior to applying at Stateville, Pattison was a Life Skill Specialist, spending 40% of his time chairing a Statewide committee on leisure-time programming and standards for the Wisconsin Division of Corrections.

## SELECTION PROCESS

A screening committee was chosen by assistant Warden O'Leary to interview both men. The panel consisted of O'Leary and Superintendent Boles and Venegone. Boles was the superintendent in charge of the leisure-time–activity department and Venegone held the same position immediately prior to Boles. All three members of the panel were white.

According to the administrative law judge's findings of fact, allegedly based upon a preponderance of the evidence, during the course of the interviews, Pattison presented the panel with an organized program expanding leisure-time activities beyond athletics and pointed to a variety of facilities he would utilize and programs he would modify and improve. Adams, on the other hand, stated that he could maintain the status quo if permanently appointed Activity Program Supervisor. Based on the above, the panel recommended to Warden DeRobertis

that Pattison be hired as Activity Program Supervisor since Pattison's goals were allegedly more in line with Corrections' desire to expand leisure-time activities beyond athletics, and because Pattison's credentials were allegedly superior to Adams. Accordingly, on October 20, 1980, DeRobertis appointed Pattison to the position of Activity Program Supervisor. Pattison served in that capacity until May 24, 1982, when he resigned, at which time Adams again applied for the Activity Program Supervisor position and was again denied the promotion.

At the administrative hearing on his discrimination complaint Adams offered evidence negating Corrections' assertion that it intended to expand the leisure-time program at Stateville. Adams testified that he did not suggest any changes in the activity program because, while Adams was acting Activity Program Supervisor, assistant Warden O'Leary informed him that no changes were to be made in the program which had been planned prior to Vail's termination. Although O'Leary denied that he limited Adams' responsibilities, he did not refute that the conversation took place and only said that he could not recall the specifics. The evidence also indicates that the panel had no clear-cut selection criteria; that Warden DeRobertis spoke to O'Leary about Pattison prior to the panel's selection of Vail's replacement; and that the Warden was listed as a reference on Pattison's resume.

On March 1, 1983, the administrative law judge entered an order recommending that the Commission dismiss Adams' claim, finding that Pattison was the better qualified candidate, citing the reasons proffered by Corrections in support of its decision to hire Pattison over Adams. The administrative law judge concluded that *inter alia*, Adams failed to demonstrate that the reason articulated by Corrections for its action was not pretextual. Adams took exception to the administrative law judge's findings of fact and conclusions of law and failed objections with the Commission. The Commission determined that the administrative law judge's decision was against the manifest weight of the evidence, reversing the administrative law judge's findings and remanding the cause to the administrative law judge for a determination of Adams' damages.

HEARING ON DAMAGES AND CONSTRUCTIVE DISCHARGE

At the administrative law judge's hearing on damages, Adams testified that he resigned from Corrections in September 1982, because he had been rejected a second time for the position of Activity Program Supervisor the previous August. (The record indicates that Pattison had resigned as Activity Program Supervisor in June 1982.)

According to Adams, he felt that he had been constructively discharged and that he was therefore entitled to full back pay from the date of his resignation. The administrative law judge recommended that a finding be entered that Adams was not constructively discharged. The Commission accepted that recommendation as not against the manifest weight of the evidence.

## ADMINISTRATIVE REVIEW

Corrections filed a complaint in administrative review asking the circuit court to overturn the decision and award of damages entered against it by the Commission. In response, Adams argued that the Commission correctly held that Corrections discriminated against him because of his race, but Adams also argued that the Commission's decision of no constructive discharge was against the manifest weight of the evidence. On June 6, 1985, the circuit court reversed the decision of the Commission, finding that the administrative law judge's decision was not against the manifest weight of the evidence, and that Adams failed to prove the charge of racial discrimination he brought against Corrections. Consequently, the circuit court never reached the issue of whether the Commission's finding of no constructive discharge was against the manifest weight of the evidence. This appeal by Adams and the Commission followed.

## OPINION

### I

The first assignment of error alleged by both Adams and the Commission is that the circuit court erred when it evaluated the findings of fact and conclusions of law of the administrative law judge rather than those of the Commission. Corrections, in turn, contends that the circuit court's decision was proper because the findings of the administrative law judge were not contrary to the manifest weight of the evidence. We agree with the position taken by Adams and the Commission that the circuit court erred by substituting its judgment for that of the Commission, and thereby failed to apply the proper standard for administrative review of the Commission's decision.

Pursuant to the Human Rights Act, the Commission is the administrative agency charged with the duty to adjudicate employment discrimination claims based on, *inter alia*, race. (Ill. Rev. Stat. 1983, ch. 68, par. 1—102(A).) In an effort to effectuate this purpose, the Act provides that, "[i]n its discretion, the Commission may designate a hearing officer to conduct a hearing into the factual basis of the mat-

ter at issue." (Ill. Rev. Stat. 1983, ch. 68, par. 8—103(B).) After such hearing, the hearing officer (here the administrative law judge) is required to issue to the Commission a recommended order and decision regarding the case. (Ill. Rev. Stat. 1983, ch. 68, par. 8—106(F)(4).) The Commission then reviews the record in order to determine whether it should "adopt, modify or reverse in whole or in part the findings and recommendations of the hearing officer." (Ill. Rev. Stat. 1983, ch. 68, par. 8—107(E)(1).) The Act directs that, "[t]he Commission shall adopt the hearing officer's findings of fact if they are not contrary to the manifest weight of the evidence" (Ill. Rev. Stat. 1983, ch. 68, par. 8—107(E)(2)), that is, the final decision of the administrative agency must be just and reasonable in light of the evidence presented. *Washington v. Civil Service Com.* (1981), 98 Ill. App. 3d 49, 52-53, 423 N.E.2d 1136, 1139, citing *Davern v. Civil Service Com.* (1970), 47 Ill. 2d 469, 269 N.E.2d 713, *cert. denied* (1971), 403 U.S. 918, 29 L. Ed. 2d 469, 91 S. Ct. 2229.

 ■ Final administrative decisions of agencies like the Commission are subject to judicial review pursuant to section 8—111 of the Act (Ill. Rev. Stat. 1983, ch. 68, par. 8—111). On administrative review, neither the circuit court nor this court is to reweigh the evidence or determine the credibility of the witnesses, which is to be made by the agency hearing the case. (*Dotson v. Bowling* (1981), 102 Ill. App. 3d 340, 430 N.E.2d 44.) Rather, the function of the court is limited, as Adams and the Commission have argued, to ascertaining whether the final decision of the *administrative agency* (here the Commission) is against the manifest weight of the evidence. *Davern v. Civil Service Com.* (1970), 47 Ill. 2d 469, 269 N.E.2d 173, *cert. denied* (1971), 403 U.S. 918, 29 L. Ed. 2d 469, 91 St. Ct. 2229; accord, *Burnham City Hospital v. Human Rights Com.* (1984), 126 Ill. App. 3d 999, 467 N.E.2d 635; *Okino v. Department of Corrections* (1980), 84 Ill. App. 3d 1084, 403 N.E.2d 1369.

In the instant case it is clear that the circuit court misapplied the above standard of review where the circuit court's order stated:

> "My opinion is that the evidence presented before the Administrative Law Judge was supported by the fact of the superior qualifications of Mr. Pattison *** and therefore the Human Rights [Commission's] decision must be reversed and a finding of no discrimination is hereby ordered.
>
> * * *
>
> The Human Rights Commission erred in not adopting the findings of the Administrative Law Judge as the Administrative Law Judge's findings were not against the manifest weight

of the evidence."

Such a review of the administrative law judge's decision was not contemplated by the Act and the case law which vest the legitimate decision-making authority in the Commission and not its hearing officer. Indeed, the Commission is free to reject the recommended order and decision of the hearing officer if it is against the manifest weight of the evidence. See, *e.g.*, *Starkey v. Civil Service Com.* (1983), 97 Ill. 2d 91, 454 N.E.2d 265.

■ Here the circuit court clearly erred by focusing on the findings and decision of the administrative law judge rather than the Commission. We find this to be an impermissible invasion by the circuit court of the discretion of the Commission. Accordingly, we conclude that the circuit court misapplied the manifest-weight-of-the-evidence standard of review under the facts of this case by substituting its judgment for that of the administrative agency.

## II

■ We now focus on the issue of whether the Commission's decision was indeed against the manifest weight of the evidence. In reviewing employment discrimination actions under the Act, this court utilizes the three-step analysis espoused by the supreme court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. (*Oak Lawn v. Illinois Human Rights Com.* (1985), 133 Ill. App. 3d 221, 478 N.E.2d 1115.) Under this approach, complainant must first prove, by a preponderance of the evidence, a *prima facie* case of unlawful discrimination. This creates a rebuttable presumption that his employer unlawfully discriminated against him. (133 Ill. App. 3d 221, 223, 478 N.E.2d 1115, 1117.) Second, complainant having proven a *prima facie* case of unlawful discrimination, the burden of persuasion shifts to his employer to clearly set forth that there is a legitimate, nondiscriminatory reason for its employment decision. (133 Ill. App. 3d 221, 223-24, 478 N.E.2d 1115, 1117.) Finally, if the employer meets its burden of proof, then the presumption of unlawful discrimination drops from the case. Thus, in order to show that his employer unlawfully discriminated against him, complainant must prove by a preponderance of the evidence that the "legitimate reason" proffered by the employer is a pretext, rather than the true reason. (133 Ill. App. 3d 221, 224, 478 N.E.2d 1115, 1117; see *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 257, 67 L. Ed. 2d 207, 218, 101 S. Ct. 1089, 1096; see also *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 804-05, 36 L. Ed. 2d 668, 679, 93 St. Ct. 1817, 1825.) Even though the burden rests on complainant to

prove discrimination by a preponderance of the evidence, he need not offer direct evidence that a discriminatory reason motivated his employer. Likewise, he need not show direct evidence of pretext. Instead, if complainant can show that his employer's proffered explanation is unworthy of belief, he has met his burden. *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089; *K mart Corp. v. Illinois Human Rights Com.* (1984), 129 Ill. App. 3d 842, 473 N.E.2d 73.

In this case, that Adams established a *prima facie* case, and that Corrections articulated an allegedly nondiscriminatory reason for its decision is undisputed. The issue lies in "step three" of the *McDonnell Douglas* analysis, *viz*: whether Adams has proved by a preponderance of the evidence that Correction's articulated reason for hiring Pattison instead of him is pretextual.

■■ ■ Illinois administrative-review law, as well as the Act, require that a court reviewing the decision of the Commission sustain the agency's findings of fact as *prima facie* true and correct unless they are contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1983, ch. 110, par. 3—110 (Administrative Review Law); Ill. Rev. Stat. 1983, ch. 68, par. 8—111(A)(2) (Illinois Human Rights Act); accord, *Davern v. Civil Service Com.* (1970), 47 Ill. 2d 469, 269 N.E.2d 713, *cert. denied* (1971), 403 U.S. 918, 29 L. Ed. 2d 469, 91 S. Ct. 2229; *Board of Education v. Human Rights Com.* (1985), 135 Ill. App. 3d 206, 448 N.E.2d 958.) Given the above, we necessarily conclude that the Commission's decision that Adams proved by a preponderance of the evidence that the reasons articulated by Corrections for failing to promote him were pretextual is amply supported by the record, and the Commission's decision is not against the manifest weight of the evidence.

In the instant case, the Commission's written decision stated in part:

"1. The Recommended Order and Decision of the Administrative Law Judge is reversed;

2. The Findings of Fact and Conclusions of Law of the Administrative Law Judge are accepted as the findings and conclusions of this Commission with the following exceptions:

A. The Commission finds that the reasons articulated by the Respondent (DOC) for its failure to promote the Complainant (Adams) were pretextual.

B. The Commission finds that the Respondent [DOC] discriminated against the Complainant [Adams] in violation of Section 2—102(A) of the Human Rights Act by failing to pro-

mote him."

In its discussion of the evidence of pretext in this case, the Commission points out several factors supporting this conclusion. One of the most significant of these factors is the written evaluation of Adams' performance in the leisure-time–activities department at Stateville. It was accepted as an uncontested fact before both the administrative law judge and the Commission that Adams' performance was highly regarded by his supervisor, Vail. Vail characterized Adams as one of the top leisure-time–activity persons in Illinois, stating that Adams had "demonstrated the ability to perform a superior role." Adams was considered to excel in leadership, job knowledge, follow-up, and perhaps most importantly, human relations. Indicative of his educational and professional background, he was appointed "Acting APS" prior to Pattison's appointment; a role he filled previously when Vail was absent.

The only additional evidence regarding Adams' performance are conflicting statements regarding his job as "Acting APS." Adams offered evidence that assistant Warden O'Leary told him he was performing his job well. However, O'Leary and the other members of the selection committee stated after choosing Pattison that Adams had certain weaknesses as a manager. No evidence exists supporting this asserted dissatisfaction *prior* to the selection process.

A second and equally important factor is Correction's explanation that Pattison's desire to expand the leisure-time–activities department beyond athletics made him better qualified for the job. Adams offered evidence negating this assertion that such an expansion was truly contemplated by Corrections. Adams testified that while he was "Acting APS," O'Leary told him no changes were to be made and that there was little room for additional programs. O'Leary admitted that a conversation regarding the leisure-time program took place, but testified that he could not recall the specifics.

The record also reflects that during Pattison's interview, O'Leary indicated what he would expect from the new Activity Program Supervisor; whereas Adams was not so informed. Consequently, Adams told the panel he would maintain the status quo, which Corrections later stated made Adams less desirable for the job.

Further, the record does not bear out any objective criteria used by the selection committee in evaluating Pattison and Adams. Although Pattison's academic background could arguably be considered more favorable, both candidates received a grade of "A" on the competitive promotional examination administered by the Department of Personnel.

Finally, it is clear that Warden DeRobertis intervened in the selec-

tion process on Pattison's behalf. The Commission found that DeRobertis spoke with O'Leary about Pattison, and that DeRobertis was listed as a reference on Pattison's resume. The Commission stated that this called into question the independence of the selection process itself.

In consideration of the record before the Commission, we hold that the evidence is sufficient to support the Commission's determination that Adams proved by a preponderance of the evidence that the Correction's articulated reasons for not promoting him are unworthy of credence, and therefore pretextual. (See *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089; *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.) Corrections offered only subjective evidence of its plans for future expansion of the leisure-time–activities program as its basis for hiring Pattison. This took the form of self-serving assertions by Corrections personnel which the Commission found to be of little weight in light of Adams' uncontested and highly favorable performance evaluation made by Vail, his supervisor, and then Activity Program Supervisor. (See *Schellhardt & Waterloo Community School District No. 5* (1981) 2 Ill. HRC Rep. 61 (cited in the Commission's decision).) It was unrefuted that Warden DeRobertis intervened on Pattison's behalf and that no real objective criteria was used by Corrections in making its decision.

Consequently, we cannot, as a matter of law, find that the Commission's decision was not supported by the evidence so as to be against the manifest weight of the evidence. Accordingly, we affirm the decision of the Commission that: (1) the reasons articulated by Corrections for its failure to promote Adams were pretextual; and (2) Corrections discriminated against Adams in violation of section 2—102(A) of the Act (Ill. Rev. Stat. 1983, ch. 68, par. 2—102(A)) by failing to promote him.

### III

Finally, we briefly address Adams' contention that he was constructively discharged when he was refused promotion to the position of Activity Program Supervisor a second time. The record indicates that Pattison resigned in June 1982, and that prior to that time Adams had taken "leave" from Corrections. While on leave, Adams returned for only one day to interview for Pattison's vacancy. In August 1982, Adams application was again rejected, and on September 7, 1982, Adams resigned without ever returning to work.

As noted above, the Commission issued an order and decision on

November 14, 1983, remanding Adams' discrimination action to the administrative law judge for a determination of Adams' damages. The administrative law judge rejected Adams' argument that he was constructively discharged, finding that his resignation was voluntary, and that Correction's responsibility for damages should end on the date of his resignation.

In his exceptions to the administrative law judge's finding, Adams argued that his resignation was the result of a constructive discharge and that Corrections should pay him the difference between the amount of money he earned after his resignation and the amount he would have earned had he been promoted to Activity Program Supervisor. The Commission, however, agreed with the administrative law judge's finding that Adams had only demonstrated that he was angry at Corrections for not promoting him, and that his resignation was voluntary.

The Commission's refusal to recognize Adams' claim of constructive discharge was incorporated into the damage award which Corrections subsequently appealed to the circuit court sitting in administrative review. This award of damages was predicated on the Commission's finding of a pretext, which we have found to have been erroneously reversed by the circuit court. It is only logical that the circuit court's erroneous reversal of the Commission's finding of a pretext in the underlying discrimination action also reversed the Commission's damage award, with which Adams' allegation of constructive discharge is inextricably mixed. Therefore, the circuit court did not consider the issue of constructive discharge as it was then moot.

In the instant case, however, we have reversed the circuit court's decision and have found the Commission's findings and decision to be supported by the evidence. The claim of constructive discharge, however, was never and is not now before us. Insofar as Administrative Review Law directs that jurisdiction to review final administrative decision is vested in the circuit court (Ill. Rev. Stat. 1983, ch. 110, par. 3—104), and insofar as the Act directs that judicial review of the Commission's decision be brought in accordance with the provisions of the Administrative Review Law (Ill. Rev. Stat. 1983, ch. 68, par. 8—111(A)(1)), we remand the constructive discharge issue to the circuit court for proceedings consistent with this opinion, including but not limited to a determination as to whether the issue of constructive discharge has been properly raised on administrative review.

Reversed and remanded with directions.

JIGANTI and McMORROW, JJ., concur.