MAUREEN SCHMEIER, Plaintiff-Appellee, v. CHICAGO PARK DISTRICT *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 1—96—3054

Opinion filed September 30, 1998.

18

Nelson A. Brown, Jr., of Chicago, for appellants.

Lonny Ben Ogus, of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:
Defendants Chicago Park District (the District) and Personnel Board of the Chicago Park District (the Board) appeal an order of the

circuit court of Cook County reversing the decision of the Board and reinstating plaintiff Maureen Schmeier to her position with the District with full back pay.

The District hired Schmeier as a gymnastics instructor in August 1991. In September 1992 Schmeier filed a charge against the District with the Illinois Local Labor Relations Board, naming her supervisor, Jacquelyn White, and White's assistant, Monte Kimes, as offenders.[1] Later in September Schmeier was suspended from employment because she had allowed her United States Gymnastics Federation (USGF) safety certification to lapse. Approximately three weeks after her suspension Schmeier became recertified and was reinstated in her position.

In November 1992 White brought disciplinary charges against Schmeier, asking for an immediate emergency suspension and recommending that she be terminated because she allegedly threatened violence against White and Kimes. Schmeier was suspended for approximately eight months for the purported threats pending a hearing. Additional charges (see below) were raised before a "pre-suspension" meeting in May 1993. Schmeier was terminated after that meeting, in June 1993. The acting Attorney General of the District sent Schmeier a "Statement of Charges Resulting in Termination" in June, which revealed she had been terminated for three types of misconduct:

> "(1) Ms. Schmeier made verbal threats of physical violence against her supervisors during her temporary assignment at Whitney Young in October/November, 1992.
>
> (2) While employed in the gymnastics program, Ms. Schmeier repeatedly engaged in inappropriate conduct by making racially offensive and derogatory remarks to co-workers, which created a disruptive and discordant work environment and adversely affected staff morale and efficiency of program operations.
>
> (3) Ms. Schmeier improperly destroyed Park District property while assigned to the Sherman Park gymnastics center by cutting rolls of floor exercise matting without approval or authorization, thereby voiding the manufacturer's product warranty and rendering the matting useless for its intended purpose."

In July 1993 Schmeier requested a hearing and review of this decision. The matter was set for a hearing before a hearing officer[2] in

---

[1] It appears that this matter is currently before this court on appeal, but no effort has been made by the parties to consolidate the two cases nor has either party moved to supplement the record in this case.

[2] The record does not reflect before whom the May 1993 pretermination hearing was held.

April 1994. The charges considered at the hearing were both Schmeier's lapsed USGF certification (which resulted in her suspension) and the three charges stated above (which were the basis for her termination).

At the hearing the District called eight witnesses. Its first witness was White. White testified that she had been with the District since 1955 and had been in charge of the gymnastics program since it was established in 1989. She stated that the program was instituted with the aim of making gymnastics accessible to the underprivileged in inner-city areas, and it had a large minority enrollment—approximately 60% to 65% African-American, plus a significant Hispanic population. White had supervisory control of the gymnastics instructors at all times Schmeier was employed by the District, as did her assistant, Monte Kimes, whose title with the District was "Program Coordinator."

White stated that Schmeier's regular assignment was Sherman Park, at 51st and Racine. White believed it would be classified as an inner-city area. The population was almost 100% African-American. White stated that Schmeier was informed during the interview process that she would be assigned to that location, because she was hired specifically to fill the vacancy created when Preston Knauf, the previous instructor at Sherman Park, left to become a stuntman at Disney World. Schmeier said she had worked with inner-city kids before, and there would be no problem.

White stated Schmeier's performance was acceptable during the first six months of her employment, which was a probationary period for District employees. However, after the probationary period ended, Schmeier seemed constantly to complain. White gave the example of Schmeier's concern about not having a working telephone in the building to which she was assigned, although there was one across the street, less than 30 feet away.

White stated that USGF certification was important both to keep instructors aware of how to keep the gym safe and also for insurance purposes. To be certified by the USGF an instructor had to take and pass a six- or nine-hour course and had to be recertified every four years. White believed Schmeier was USGF certified when she was first hired, but subsequently allowed her certification to lapse. The District discovered her certification had lapsed through Kimes, White's assistant. Kimes was a safety certifier, and White said the instructors' certifications were frequently checked. When it was discovered that Schmeier's certification had lapsed, she was suspended until she

became recertified. White was not aware that Schmeier ever offered to explain why her certification had lapsed.

White also was aware of an incident in which Schmeier allegedly made threats of physical violence, although she was not present when the threats were made. When White began to relate the details of the incident, counsel for Schmeier objected that her testimony was hearsay. Counsel for the District stated that the information was not being offered for the truth of the matter asserted but, rather, only to show "what the basis for her subsequent actions were, whether or not what she was told was true or false." The hearing officer allowed White to testify, but only for this purpose.

White testified that another gymnastics instructor for the District, Hong Jiang, told her that Schmeier "had threatened some type of physical violence against her supervisors if she in fact got fired," namely, that she would shoot White and Kimes. White took the alleged threat very seriously. It was because of Jiang's information that White asked for the emergency suspension of Schmeier.

Disciplinary charges were also brought against Schmeier for making racially offensive or derogatory remarks. Again, when White began to discuss details, Schmeier's attorney objected on hearsay grounds, and again the hearing officer allowed White to testify only for the purpose of establishing a foundation for her subsequent actions, not for the truth of what White had been told. White said her secretary, Barbara Collins (who is African-American), had told her that Schmeier had once referred to "gang bangers" as her (Collins's) "brothers and sisters" in relation to an incident in which Schmeier's husband was robbed. White believed Collins felt Schmeier had used "brothers and sisters" in a very derogatory manner, and White thought Collins felt Schmeier was a bigot and was very upset by the incident.

White testified she received similar complaints from other employees. She testified that Daryl Harden and George Martenia told her Schmeier had offered them a ride home, and while in the car she said "she didn't know being in a black park meant dealing with gang bangers, that your brothers and sisters, something to that effect, were gang bangers." Also, she received a memo from Lloyd Bachrach (District exhibit No. 12) which stated that Schmeier "seems to lack patience with black students."

The final basis for Schmeier's termination was destruction of District property. White received a memo from Kimes (District exhibit No. 17), which stated that foam underlying the floor exercise mats at Sherman Park had been cut. Although the memo did not mention Schmeier's name, White inferred that it had been she who had cut the foam. White explained that the gyms were set up in September and

broken down in May; there was no indication the foam had been cut when the gym was set up in September; and Schmeier had been the only instructor working at Sherman Park.

Finally, White was asked to summarize the reasons for her request that the District terminate Schmeier's employment. She stated that her primary complaint was that she did not think Schmeier wanted to work in the inner city. She also thought Schmeier was not happy with the District, and her skill level was "at best mediocre." She stated that the District could have helped her through clinics, but "you can't come into the type of program we have and be a bigot." She explained that by the last statement she meant she believed Schmeier "does not like black people or working with black people, and does not treat them fairly." When she was asked if there were any other reasons, she stated that Schmeier "just didn't fit with the program, because of her attitude toward the inner city." White did not mention the alleged threat.

On cross-examination White stated that enrollment in the gymnastics program at Sherman Park increased by approximately 10% to 15% when Schmeier took over. White also admitted that she never actually measured the distance between the building to which Schmeier was assigned and the building which contained a telephone. White stated that she had not solicited any of the written complaints from their authors. She did ask Jiang to put something in writing regarding what he had heard Schmeier say because she "was in fear of [her] life." She admitted that although she did suspend Schmeier and talked to the District's attorneys, she never called the police about the threat. White did not know when Schmeier initially made the threat to which Jiang referred, but thought it was in September or October 1992. She assumed Collins, her secretary, typed the statement for Jiang (District exhibit No. 11), "because he came into the office, and I could not understand all he said, he was so excited it sounded like gibberish, so I asked her to type it." She stated she did not understand him all the time, because he speaks rapidly and in an animated fashion.

White did not see Schmeier cut any mats, but she did hear Schmeier make racial remarks about African-Americans. White stated that more than once Schmeier "has referred to them [sic] as 'those people' or gang bangers, or gang infested, or drug addicts, or many, many things that she has said about the black people at Sherman Park when she became unhappy working there."

The District's sixth witness[3] was Hong Jiang, another gymnastics instructor with the District, who testified regarding a conversation with Schmeier in November 1992. When Jiang was first asked what he heard Schmeier say, he said she had said the District was giving her a hard time, but she was not going to quit, and if she were fired, "she was going sue them [*sic*]." After this response, the following colloquy occurred:

"Q. [Mr. McVane:] Now, this is important for everyone's sake. Could you say what you just said again and speak slowly so he can get this on record?

A. [Jiang:] She say—okay. She not going quit, but if somebody make her quit, she will going sue them. That's—

Q. Just for my clarification, what did she say she was going to do if they made her quit? What word did she use?

A. She say she was going to sue them.

Q. Going to what?

A. Sue them.

Q. What do you mean by that?

A. Means like use a gun. I don't know.

\* \* \*

Q. [Hearing Officer:] Is that—that you are using the word that's associated with a gun; is that right?

A. But at that time, I—because I worried. I don't thinking that way, that's why I think just talk—

---

[3]In addition to White, the District introduced the testimony of seven other witnesses, each of whom testified, based on his or her own firsthand knowledge, to each of the charges referred to by White. In addition to the incidents outlined by White, two employees, Darion Knight and Daryl Harden, testified regarding incidents at two different locations during the summer of 1992 in which Schmeier made remarks indicating surprise that African-Americans could swim.

Because of the page limitations imposed under revised Supreme Court Rule 23 (166 Ill. 2d R. 23), we are compelled to delete our summaries of the testimony of six of these witnesses in the published portion of the opinion, as well as our summary of one of the two witnesses for Schmeier. However, these summaries are part of the unpublished portion of this decision. A full, unabridged text of this decision is on file with the clerk of this court under docket No. 1—96—3054.

We have included the full summary of the testimony of one additional District witness, Hong Jiang. The testimony of this witness provides the basis of the finding that Schmeier threatened to harm her supervisors. This finding is the purported basis of the Board's decision to reject the findings of the hearing officer. The testimony of this witness must be viewed in full detail in order to properly evaluate the correctness of the Board's disposition.

Q. [McVane:] Mr. Jiang, please, we just want to make sure right now what words you are using. So the Hearing Officer is asking you when you made that statement as far as what Ms. Schmeier said to you, was she referring to the use of a like a firearm or a gun, for example? Is that what the [sic] word she used? Did she say shoot?

A. I see. In my mind, I think I remember she says shoot them.

Q. Shoot.

Q. [Hearing Officer:] Let the record show it's still not clear whether he is saying shoot or sue.

Mr. Jiang, I am going to ask you a question. If I say the word I am going to sue them, what am I talking about?

A. You mean going use gun.

Q. If I say I am going to shoot them, what does it mean?

A. Means go to court."

Jiang did not tell anyone about the alleged threat of violence for a few days, because he did not believe Schmeier would actually do it. However, a few days later he decided to tell Kimes, and later that day he met with both Kimes and White and repeated what Schmeier had said. Afterwards, he went down to White's office and repeated it again to Collins, who typed a statement for him (District exhibit No. 11). He read it to make sure it was correct, and signed it. As transcribed, Jiang read exhibit No. 11 aloud at the hearing to state "if she were to ever get fired, she would shoot them."

Schmeier took the stand on her own behalf. She affirmed that she had been suspended for three weeks in 1992 for allowing her USGF certification to lapse, but stated that she had not known before her suspension that she had to keep a current certification, only that she had to have one when she applied or obtain one within 60 days thereafter.

She stated that she did not remember exactly what she said to Jiang at Whitney Young in 1992, but stated that at that time she had recently filed a second complaint with the Illinois Labor Relations Board, so it was very possible she would have been talking about suing. She did not remember telling him she was going to sue, but she remembered being at Whitney Young, talking with him and saying she was unhappy. She stated she never indicated to Jiang that she would shoot anyone; she is not a violent person by nature, does not own a handgun, and does not allow her children to play with toy guns or watch violent television shows.

She remembered having given Martenia and Harden rides home more than once, and specifically once in or about September 1992. She did not remember making any derogatory statements about African-Americans, nor any statements indicating that all African-Americans

were muggers or drug dealers, or stating that there were gangs in African-American areas. She admitted that her husband had been robbed in July or August 1992, and she did tell at least some people in the District about it because the day it happened she took personal leave to be with him. She did not specifically recall talking with Harden and Martenia about the incident, but admitted it was possible she had. At first she did not remember anything specific that she said during the van ride with Martenia and Harden, but then recalled that she had talked about requesting a transfer out of Sherman Park because it was a depressed economic area, and there were gangs. She stated that what upset her was the fact that she was alone in a building until 9 at night with no telephone. She said people had warned her it was an African-American park when she took the job, but said she did not care; it was not until she began working that she realized it was a dangerous situation because of the late hours and lack of a telephone.

Schmeier knew that Bachrach had written a letter to White about her at White's request, but she had not seen it until the hearing. After he told her that White had requested the letter she asked him several times if she was doing anything wrong, and he always told her she was doing fine.

She did remember speaking with Collins shortly after her husband had been robbed. She was very upset at what had happened, but did not volunteer that the robber was African-American; rather, she told Collins this only after Collins asked her. She never stated that African-Americans were robbers and thugs. She stated that she had given Collins rides home on more than one occasion.

Schmeier stated that some mats were cut when she arrived at Sherman Park in August 1991. She did not know who had cut the mats, and she never cut any herself. Kimes visited the gymnastics center at Sherman Park between four and six times from August 1991 through the summer of 1992 and never said anything to her about the mats being cut. She admitted she had moved some equipment and mats with the help of Reggie Dominic in 1992, but she did not cut any mats.

Schmeier testified that she never made any comment at Whitney Young to the effect of being surprised that African-Americans could swim; in the summer of 1992 she was assigned to Broadway Armory, not Whitney Young. She was assigned to North Avenue Beach at one point, but did not think she spoke to Knight.[4]

In September 1994 the hearing officer issued his recommended de-

---

[4]We note that seven pages of the transcript of Schmeier's testimony were omitted from the record submitted to this court. None of the parties, however,

cision. After a 27-page recitation of the evidence, he analyzed each of the four charges separately. He upheld Schmeier's three-week suspension for allowing her USGF certification to lapse, but felt it would be inappropriate to base her termination on this charge, as it would constitute double punishment.

Regarding the second charge, that Schmeier had threatened physical violence against her supervisors, the hearing officer held the District had

> "presented no credible evidence that Ms. Schmeier ever made any threats of physical harm to anyone. All testimony in support of the district's accusation is based upon what Hong Jeong [*sic*] said he thought he heard Ms. Schmeier say. However, it is clear that Mr. Jeong, because of his lack of fluency in the English language, cannot distinguish between the words 'shoot' and 'sue.'"

In corroboration of the foregoing, the hearing officer noted that the alleged threat did not appear to have been taken seriously, as no one called the police or filed a charge, nor did anyone keep Schmeier from work or from co-employees or park patrons. The hearing officer also found the testimony regarding Schmeier's nonviolent disposition undercut the likelihood of her having made such a threat. He therefore found "the charge that Ms. Schmeier was fired because she threatened to cause physical hard [*sic*] to her supervisors lacks credibility and is groundless."

The hearing officer identified the charge of Schmeier's racist conduct and statements as "the most serious and troublesome" of the charges against her. Nevertheless, he found the charge did not support her termination. He noted that the portion of the District's code of conduct that the District charged that this conduct violated was section I-E, which states: "An employee shall be respectful and polite in conduct while on duty or on park property." Assuming that Schmeier did make the statements of which she was accused, the hearing officer noted that the comments to Martenia and Harden did not violate section I-E, because they occurred off park property and off duty. The comments to students about which Bachrach testified were not relevant to the charge against her, which was specifically that she "engaged in inappropriate conduct by making racially offensive and derogatory remarks to co-workers, which created a disruptive and discordant work environment and adversely affected staff morale and efficiency of program operations." Nor had any employee testified regarding any effect Schmeier's statements might have had on the

---

has raised any issue as to any material testimony that those pages may have contained.

work environment, staff morale or efficiency of program operations. However, the reason the hearing officer finally concluded this charge did not support Schmeier's termination was the District's "Guidelines for Discipline." Because disrespectful, impolite conduct was not listed as "Group A" (most serious) or "Group B" (second most serious) misconduct, he reasoned, it could only be "Group C" misconduct—for which termination was allowed only for the third violation after the District had rendered two previous penalties, including an oral or written reprimand and a 5- to 30-day suspension. Thus this charge would not support her termination.

The hearing officer also held that termination was not supported by the final charge, which attributed to Schmeier the destruction of District property by the cutting of the mats at Sherman Park. First, he concluded there was insufficient evidence that Schmeier had actually been the one who had cut the mats. He characterized Kimes's investigation as "cursory at best" and noted that the testimony of Harden that Reggie Dominic had told him that he had helped Schmeier cut the mats was inadmissible hearsay. He also noted that even assuming it was Schmeier who cut the mats, there was no evidence to support a finding that she had cut them in "such a manner as would be considered 'willful or malicious' destruction of [District] property—and therefore subject to discipline under Group A misconduct—or 'grossly negligent damage' under Group B." Thus, as with the charge of the racist remarks, the conduct would not support a termination even if she had engaged in it.

The hearing officer concluded that the District had wrongfully terminated Schmeier and she should be reinstated with back pay and benefits to put her in the same position as if she had not been terminated.

Becky Frederick, superintendent of employment and secretary of the Personnel Board, sent Schmeier a copy of the hearing officer's decision with an accompanying letter stating:

> "Exceptions must be filed in writing and received by the Office of the Superintendent of Employment *** no later than ten (10) calendar days after the date of this letter.
>
> Timely filed exceptions will be considered by the Personnel Board together with the Hearing Officer's recommended decision. The Board will thereupon render its final decision on the case."

The District filed exceptions in August 1995, approximately 11 months after the hearing officer's recommendation was issued. It first noted that Schmeier's failure to maintain USGF certification had not been advanced as a basis for her termination but, rather, had been presented to the hearing officer separately, in its own right, to

determine whether the initial three-week suspension had been validly imposed. The termination was not predicated on the certification lapse, but on the other three charges, namely, the aforementioned alleged threats, racist speech and property destruction. The District argued each of these charges had been proven by a preponderance of the evidence and requested that the Board reject the hearing officer's recommended decision and affirm both the suspension and termination of Schmeier.

The Board held hearings on the case twice, once in August 1995 and once in September. On October 26, 1995, the Board issued two orders. One order affirmed the hearing officer's recommendation to uphold the suspension for failure to maintain certification. The second order agreed with the hearing officer that termination was inappropriate. However, it went on to reject the recommendation that Schmeier be reinstated with back pay. The Board ordered that termination would be commuted to suspension from June 30, 1993, to October 23, 1995; it reinstated her effective October 23, but without back pay or benefits. The Board also required Schmeier to "participate in a racial sensitivity training session to be arranged by the Department of Personnel" and placed her on strict disciplinary review for one year. However, the Board's order made no reference to the propriety of Schmeier's eight-month emergency suspension for the alleged threats pending her hearing.

The order of the Board did not contain any factual findings. In addition to the absence of factual determinations, the Board did not state what provisions of the code of conduct it determined Schmeier had violated, nor pursuant to which provision(s) of the District's guidelines for discipline the discipline was imposed.

Schmeier appealed to the circuit court of Cook County. Her complaint was in two counts. Count I sounded in administrative review and requested that the court "reverse those portions of the October 26, 1995 Order [of the Board] which reversed, or did not sustain, any portion of the Recommendation of the Hearing Officer," award her "full back pay and benefits as if she had not been terminated or suspended from October 20, 1992, to October 23, 1995," and order that she not be required to participate in the racial sensitivity training session or placed on strict disciplinary review. Count II, which alleged a violation of her constitutional rights, is not before us on this appeal.

After the complaint had twice been amended, the court by written order granted Schmeier's motion for judgment on count I "consistent with the decision rendered in open court." At the hearing to which the court's written order referred, the court stated that with respect to count I it would "grant the relief prayed. That is, that the Petitioner's

personnel record be expunged of references to suspension, that any benefits or salary lost be reinstated," because "the record filed with this Court is insufficient to support the action taken by the Personnel Board." The court found its decision on count I was a final and appealable order under Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) and that there was no just reason to delay enforcement or appeal of its ruling on count I. The Board has now brought this appeal from the court's ruling on count I.

In essence, the issues raised by the Board are relatively straightforward. It argues it was not required to adopt the hearing officer's findings, and this court should treat its order as containing implicit factual findings—different from the hearing officer's—which support its order. If we are not willing to infer findings from its order, it argues the proper mode of proceeding is not to reverse outright but, rather, to remand the case to the Board with directions to make findings. Second, it argues the facts and law support its resolution of the case. Specifically, it argues its (implicit) finding that Schmeier had committed disciplinary violations (especially the act of threatening her supervisors) was supported by the record and was not against the manifest weight of the evidence and its decision to suspend Schmeier for two years and four months was within its discretion since it would have been justified in terminating her. Finally it argues the District's lateness in filing with the Board its exceptions to the hearing officer's recommendation should have no effect on the outcome of the case.

Schmeier argues that the District's late filing of exceptions should have barred it from objecting to the hearing officer's recommendation. In the alternative, she argues that the Board had the obligation to make explicit factual findings sufficient to support its order, and its failure to do so is grounds for outright reversal. She argues the length of the suspension in this case was an abuse of discretion. And she argues that even if we were to accept the Board's argument regarding "implicit" findings of fact, we should hold those findings to have been against the manifest weight of the evidence.

## ANALYSIS

### I. Jurisdiction

As a preliminary matter, the Board and the District have filed a motion in this court to dismiss for lack of subject-matter jurisdiction any portion of the circuit court's order and this appeal that deal with Schmeier's three-week suspension for failure to maintain her USGF certification. They argue that since the Act only provides for appeal to the circuit court of terminations or suspensions of 30 days or more, this less-than-30-day suspension is not properly appealable.

■ We deny the motion as moot, as our review of Schmeier's circuit court complaint reveals that she only requested reversal of "those portions of the October 26, 1995 Order which reversed, or did not sustain, any portion of the Recommendation of the Hearing Officer." The hearing officer had recommended that the three-week suspension was reasonable and should be upheld, and accordingly the Board's separate order affirming the three-week suspension was not put at issue in the circuit court. Nor did Schmeier request relief from the three-week suspension in any other portion of her circuit court brief. We find this order was not appealed from, and thus the question whether it could have been appealed is moot. We do not believe the circuit court purported to grant relief on this issue. To do so would be to act beyond its jurisdiction, since the suspension was not the subject of Schmeier's appeal.

## II. Merits

■ On the merits of the appeal, the general rule in administrative review is that the findings of the agency are presumed *prima facie* true and correct (735 ILCS 5/3—110 (West 1996)) and will not be overturned unless against the manifest weight of the evidence. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992). Findings are against the manifest weight of the evidence only when it is "clearly evident" that the opposite conclusion from that at which the agency arrived is the correct one. *Abrahamson*, 153 Ill. 2d at 88, 606 N.E.2d at 1117. The law is settled that it is the findings of the *agency* that are entitled to deference, not the findings of a hearing officer or administrative law judge (ALJ). This is true even when the agency's findings differ from those of the hearing officer and the agency has not had the opportunity to observe the witnesses. *Starkey v. Civil Service Comm'n*, 97 Ill. 2d 91, 101, 454 N.E.2d 265, 269 (1983).

The Board is correct that it need not adopt the hearing officer's findings. *Starkey*, 97 Ill. 2d at 101, 454 N.E.2d at 269. Schmeier argues that an agency may only reject the findings of a hearing officer or ALJ if those findings are against the manifest weight of the evidence, citing *Department of Corrections v. Adams*, 146 Ill. App. 3d 173, 181, 496 N.E.2d 1138, 1143 (1986). We find *Adams* inapposite. *Adams* involved the Human Rights Commission, which is required by statute to adopt a hearing officer's findings " 'if they are not contrary to the manifest weight of the evidence.' " *Adams*, 146 Ill. App. 3d at 180, 496 N.E.2d at 1143, quoting Ill. Rev. Stat. 1983, ch. 68, par. 8—107(E)(1) (now 775 ILCS 5/8A—103(E)(1) (West 1996)). Our attention has not been drawn to any statute or rule requiring the Personnel Board of the Chicago

Park District to accord deference to the factual findings of its hearing officers. Thus, in this case the rule as articulated in *Starkey* applies, pursuant to which the Board may review the conclusions of its hearing officer *de novo*. See *Lachenmyer v. Didrickson*, 263 Ill. App. 3d 382, 386-87, 636 N.E.2d 93, 97-98 (1994), quoting *Gregory v. Bernardi*, 125 Ill. App. 3d 376, 379, 465 N.E.2d 1052, 1056 (1984) (the State of Illinois Department of Employment Security Board of Review, although not entitled to conduct a *de novo hearing* (*i.e.*, it must consider the evidence adduced before the hearing officer), " 'is to make its own independent assessment of the evidence on record and need not defer to the findings of the referee' ").

Schmeier next contends as grounds for reversal the fact that in this case the Board did not make any findings in support of its decision. Its one-page order simply provided that it had "heard" the hearing officer's recommendation and received the District's exceptions. Without making any explicit findings of fact or stating whether it agreed or disagreed with any of the findings of the hearing officer, it made its decision. The Board argues that based on the District's "Guidelines for Discipline" (Guidelines), which it asserts are controlling in this case, we should infer findings of fact—or at least one finding of fact—from its result. We disagree.

The Guidelines provide for three categories of misconduct: Group A, which comprises the most serious infractions an employee may commit; Group B, which is of intermediate severity; and Group C, the least severe. What punishment may be administered to an employee for misconduct depends on how the misconduct is classified. The penalty for Group A misconduct is "[t]ermination for first offense, absent mitigating circumstances justifying a less serious penalty"; Group B misconduct may be punished by a 10- to 30-day suspension or termination for a first offence and a 30-day suspension or termination for subsequent offenses; and Group C misconduct may be punished by an oral or written reprimand or a 1- to 10-day suspension for a first offense, a 5- to 30-day suspension for a second offense, and a 30-day suspension or termination for a third or subsequent offense.

According to the hearing officer, only Schmeier's threat against her supervisors would constitute Group A misconduct. Counsel for the Board admitted at oral arguments that only the threat charge would fit within Group A and warrant the punishment imposed on Schmeier. Even had the Board not so conceded, examination of the Guidelines reflects the findings of the hearing officer that none of the other infractions charged against the plaintiff, including the charges involving

racially tainted or offensive speech and destruction of property,[5] fall within the definition of Group A or Group B misconduct. Under the Guidelines these charges would therefore by definition constitute Group C misconduct, which is defined as "misconduct *** or the failure satisfactorily to perform the duties of the person's job other than actions defined as Group A or B misconduct." As the Board has not called our attention to any prior instances of Group C misconduct, it appears that neither of these two charges could properly have been the basis of a suspension of more than 10 days, much less the over two-year suspension imposed on Schmeier in this case.

The Board argues we should infer from the fact that Schmeier was suspended for more than 30 days that it found she had committed the alleged threats, and we should affirm that determination because it is not against the manifest weight of the evidence. If we are not willing to infer that it found Schmeier had made the threat, it argues, the proper remedy is to remand for the Board to make factual findings, not to reverse outright.

Schmeier points out that there is a strong basis for rejecting the inference that the Board found she had made the threats. If the Board had found she had threatened to kill her fellow employees, she argues, it would have terminated her outright instead of returning her to work, and if the District or her coworkers had taken the threat seriously they would have contacted the police or its own internal security unit. She argues additionally that even if we do infer that the Board found she had made the threat, and we apply the manifest weight of the evidence standard of review to that finding, the finding was against the manifest weight of the evidence.

Schmeier draws our attention to *Bell v. Civil Service Comm'n*, 161 Ill. App. 3d 644, 515 N.E.2d 248 (1987), which rejected an administrative agency's decision as "arbitrary and unreasonable" because the agency failed to set forth any facts to support its decision. *Bell*, 161 Ill. App. 3d at 651, 515 N.E.2d at 252; see also *Austin v. Civil Service Comm'n*, 247 Ill. App. 3d 399, 405, 617 N.E.2d 349, 353 (1993). However, *Bell* and *Austin* involved review of an order of the Civil Service Commission, an agency subject to the requirements of the

---

[5]The Guidelines do classify "willful or malicious" property damage as Group A misconduct and classify "grossly negligent" damage as Group B misconduct. However, the Board has not relied on these provisions as a basis for its ruling, nor, had it so relied, would we accept such reliance, since it appears plain that the cutting of mats to make them fit more closely around gymnastics equipment would not fall into either category.

Administrative Procedure Act (Act) (5 ILCS 100/1—1 *et seq.* (West 1996)). See *Bell*, 161 Ill. App. 3d at 651, 515 N.E.2d at 252; *Austin*, 247 Ill. App. 3d at 405, 617 N.E.2d at 353. The Act requires that, in contested cases, "[a] final decision shall include findings of fact and conclusions of law, separately stated." 5 ILCS 100/10—50(a) (West 1994).

■ The Board does not appear to be subject to the Act. The Act only applies to agencies (5 ILCS 100/1—5 (West 1996)) as it defines them:

"each officer, board, commission, and agency created by the Constitution, whether in the executive, legislative, or judicial branch of State government, but other than the circuit court; each officer, department, board, commission, agency, institution, authority, university, and body politic and corporate of the State; each administrative unit or corporate outgrowth of the State government that is created by or pursuant to statute, *other than units of local government and their officers,* school districts, and boards of election commissioners; and each administrative unit or corporate outgrowth of the above and as may be created by executive order of the Governor." (Emphasis added.) 5 ILCS 100/1—20 (West 1996).

Clearly the Board is an administrative unit created pursuant to statute, specifically, the Chicago Park District Act (Park Act) (see 70 ILCS 1505/16a(c)(2) (West 1996)). However, the Act does not apply to it because it is a unit of local government and is therefore specifically exempted from its provisions. The Illinois Constitution of 1970 defines units of local government as "counties, municipalities, townships, *special districts,* and units, designated as units of local government by law, which exercise limited governmental powers or powers in respect to limited governmental subjects, but does not include school districts." (Emphasis added.) Ill. Const. 1970, art. VII, § 1. The District is created by the Chicago Park District Act (70 ILCS 1505/0.01 *et seq.* (West 1996)) and it fits the definition of a "relatively autonomous local government which provides a single service." See *Chicago Transit Authority v. Danaher,* 40 Ill. App. 3d 913, 917, 353 N.E.2d 97, 100 (1976), citing J. Anderson & A. Louisin, *From Bone Gap to Chicago: A History of the Local Government Article of the 1970 Illinois Constitution,* 9 J. Marshall, J. of Prac. & Proc. 698, 700 n.8 (1976). Since the Board was created by the board of commissioners of the District (see 70 ILCS 1505/16a(c)(2) (West 1996)), the Board is an outgrowth of the District. Thus it is not an "agency" as that term is used in the Act, and section 10—50 of the Act does not apply to it. Accordingly, the holdings of *Bell* and *Austin* are inapposite.

However, this does not mean that we must adopt the Board's sug-

gested *modus operandi*, and (1) assume that it made factual findings that would render its order not an abuse of discretion, (2) search the record to figure out what such findings it could have made, and (3) uphold those findings that we guess the Board made unless they are against the manifest weight of the evidence. There are serious problems with this suggested approach, not the least of which is that it would appear to eliminate the possibility of a finding that the agency had abused its discretion. When an agency states its factual conclusions and states what action it is taking based on those findings, this court may determine whether the agency has abused its discretion and will reverse when it has done so. See *Cook County State's Attorney v. Illinois State Labor Relations Board*, 292 Ill. App. 3d 1, 6, 684 N.E.2d 970, 973 (1997). Under the Board's proposal there is no possibility of such a finding unless its findings are against the manifest weight of the evidence, because we must assume that the agency made factual findings that would support its action. Effectively, this court would become an advocate for the agency.

The Board cites *O'Boyle v. Personnel Board*, 119 Ill. App. 3d 648, 657, 456 N.E.2d 998, 1005 (1983), and *Mahonie v. Edgar*, 131 Ill. App. 3d 175, 476 N.E.2d 474 (1985), for the proposition that an administrative agency is not required to make specific findings of fact in its final order. These cases are unconvincing. *Mahonie* performs no analysis in reaching the above conclusion except citing to *O'Boyle*. *Mahonie*, 131 Ill. App. 3d at 178, 476 N.E.2d at 477. *O'Boyle*, in turn, performs no analysis and cites *Suttle v. Police Board*, 11 Ill. App. 3d 576, 579, 297 N.E.2d 174, 176 (1973), and *Massey v. Fire & Police Comm'n*, 26 Ill. App. 2d 147, 150, 167 N.E.2d 810, 812 (1960). The administrative decision being appealed in *Suttle* contained findings of fact sufficient to support its conclusion (*Suttle*, 11 Ill. App. 3d at 579, 297 N.E.2d at 176), and the appellant in *Massey* admitted all the details of all the charges brought against him (*Massey*, 26 Ill. App. 2d at 148, 167 N.E.2d at 811). This line of cases is not compelling support for the unlikely proposition that findings of fact are never required in final administrative orders.

■ However, we need not reach a final resolution of the effect of the failure of the Board to make explicit factual findings in this case beyond noting that the Act requirement of factual findings does not apply. We recognize that previous cases have held that where there were a number of possible grounds for an administrative decision, but the agency did not state its findings in its order, the appropriate course of action was to remand the case to the agency for it to make findings. *E.g., Reinhardt v. Board of Education of Alton Community Unit School District No. 11*, 61 Ill. 2d 101, 104-05, 329 N.E.2d 218, 220 (1975).

However, the reason for doing so was to ascertain the basis of the agency's decision in order to facilitate judicial review thereof. *Reinhardt*, 61 Ill. 2d at 104-05, 329 N.E.2d at 220. In this case, as previously discussed, there is no dispute that the only possible factual finding that would have supported the Board's order was the alleged threat of violence. Thus even assuming that on remand the Board would make this finding of fact, for the reasons stated below we can determine here and now that this finding would be against the manifest weight of the evidence.

As noted, Hong Jiang was the only direct witness to the alleged threat. Jiang's testimony, quoted at length above, shows that he had a difficult time making his speech understood. But more importantly, his testimony unequivocally establishes that he was insufficiently well acquainted with the English language to differentiate between the words "sue" and "shoot" as he *heard* them:

"Q. [Hearing Officer:] Let the record show it's still not clear whether he is saying shoot or sue.

Mr. Jiang, I am going to ask you a question. If I say the word I am going to sue them, what am I talking about?

A. You mean going use gun.

Q. If I say I am going to shoot them, what does it mean?

A. Means go to court."

This clearly reflects a lack of ability to *comprehend* spoken English. And it is exactly this skill that is called into question in this case— whether or not Jiang correctly understood what Schmeier was saying. Jiang's statement (dictated to Collins), which states that Schmeier threatened to "shoot them" if she were ever fired, is of no value because it rests not only on the assumption that Collins understood Jiang correctly, but also on the assumption that Jiang understood Schmeier correctly.

The Board represents to this court that Jiang's testimony was accompanied by gestures that indicate he intended all along to say that Schmeier intended to "shoot" White and Kimes. First, we may not consider the alleged gestures as they are not reflected in the record. Second, this argument misses the point: even if Jiang thought that Schmeier had used the word associated with firing a gun, the record establishes that he was unable to understand the difference between that word and the word associated with a legal action when other people said them aloud. Indeed, if Jiang was gesturing as if he were firing a gun when he said, four times in a row, that Schmeier threatened to "sue them," it reinforces rather than weakens the argument that he did not understand the word he heard. It is plain that he heard Schmeier to *say* she would "sue them" and understood this to *mean* she would use a firearm in an attempt to injure them.

Jiang's testimony is insufficient to establish that Schmeier made the threat of which she was accused. There is no other evidence in the record to support this finding. We specifically reject the suggestion by the Board that it could have relied upon White's testimony that Jiang told her that Schmeier had threatened to "shoot" her. This portion of White's testimony is hearsay, and was objected to on that basis at the hearing. Counsel for the District stated that White's testimony regarding what Jiang told her was not being offered for the truth of what she was told but, rather, simply to establish the basis for White's subsequent actions. In addition, this argument mischaracterizes White's testimony. When White was asked what Jiang had said, she stated that he had said Schmeier "had threatened some type of physical violence against her supervisors if she got fired." When she was prompted with the question "[d]id he in fact say that if she got fired she was going to shoot Monte and Jackie, something along that line?" she responded "[s]omething along that. It was very strange." There is no support here for an inference that Jiang was able accurately to comprehend the English language.

We find the conclusion that Schmeier made threats against White and Kimes was against the manifest weight of the evidence.

Because of our resolution of the previous issues, we need not determine whether the Board would have been within its discretion in imposing a two-year four-month suspension nor need we reach the question of the effect of the District's delay in filing exceptions to the hearing officer's recommendation.

## CONCLUSION

Schmeier's alleged threats against White and Kimes were the only possible factual findings that would have sufficed to uphold the discipline imposed by the Board. We have found that conclusion to be against the manifest weight of the evidence. Accordingly, the Board's order suspending Schmeier for two years and four months without pay, ordering her to participate in a racial sensitivity training session and placing her on strict disciplinary review was an abuse of discretion. We affirm the circuit court's reversal thereof. We also affirm the circuit court's restoration to Schmeier of the salary and benefits she lost during the period of "emergency suspension," from November 13, 1992, through June 29, 1993, which the Board order of suspension did not purport to address. Finally, the circuit court's order did not ad-

dress the propriety of the three-week suspension for Schmeier's lapse in USGF certification, nor do we.

Affirmed.

CAHILL and LEAVITT, JJ., concur.