# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Soto v. Board of Fire & Police Commissioners, 2013 IL App (2d) 120677**

---

| | |
|---|---|
| Appellate Court Caption | RAYMOND E. SOTO, Plaintiff-Appellant, v. THE BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY OF ST. CHARLES, ILLINOIS, and its Members, JAMES N. URHAUSEN, CRAIG A. LIVERMORE, DONALD L. HAINES, and SANDRA S. WRIGHT, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-12-0677 |
| Filed | March 21, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's order affirming the decision of defendant board of fire and police commissioners rescinding an offer of a full-time firefighter position to plaintiff lacked factual findings sufficient for judicial review; therefore, the order was reversed and the cause was remanded to allow the board to make and issue such findings. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 11-MR-556; the Hon. Thomas E. Mueller, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on          Steven T. Mann, of Law Office of Steven T. Mann, of Warrenville, for
Appeal              appellant.

                    John C. Broihier, of Naperville, for appellees.


Panel               JUSTICE JORGENSEN delivered the judgment of the court, with
                    opinion.
                    Presiding Justice Burke and Justice Hudson concurred in the judgment
                    and opinion.

**OPINION**

¶ 1       Plaintiff, Raymond E. Soto, appeals the trial court's May 22, 2012, decision affirming
the decision of defendant, the Board of Fire and Police Commissioners of the City of St.
Charles (Board), to rescind the Board's offer of a full-time firefighter position to plaintiff.
Plaintiff requests that we reverse the trial court and remand for further proceedings or
discovery. For the following reasons, we reverse and remand.


¶ 2                                    I. BACKGROUND

¶ 3       In February 2004, Soto began working for the St. Charles fire department as a paid, on-
call firefighter and paramedic. On October 24, 2008, Soto filed an application for a full-time
firefighter position. The 12-page application for employment reflects that Soto served eight
years in the United States Marine Corps, and was honorably discharged therefrom in
February 2000. Thereafter, Soto obtained an associate's degree in nursing, received training
in "CPR, paramedic, pediatric advanced life support, international trauma life support, [and]
advanced cardiac life support," and held a "paramedic, firefighter II" professional license.
The application also reflects that Soto took civil service exams for fire departments in
Carpentersville and Sugar Grove, but that the Sugar Grove list had expired. The application
asked whether Soto was ever placed on a civil service list and then subsequently either not
hired or rejected. He answered "no."

¶ 4       The application included a section requesting Soto's employment history for the past 10
years, with his present and most recent jobs to be listed first. Soto listed two jobs as being
presently held, with First Care Ambulance Service and the St. Charles fire department,
followed by six former positions. Soto listed eight references and wrote a statement that "the
challenges and rewards I have experienced serving the city of St. Charles [have] given me
a sense of pride I have not felt since my military service. I have dedicated my efforts to
achieving the training and licenses to become an asset to the team and community I have the

privilege to serve." Finally, Soto submitted to the Board his resume, which listed the following as his three most recent employers: Elgin Medi Transport Inc. (paramedic from "7/10-Present"), the St. Charles fire department, and First Care Ambulance Service.

¶ 5    Also in the fall of 2008, Soto took the Board's written examination for full-time firefighter-paramedic employment. Before those results were posted, on May 6, 2009, the Board interviewed Soto regarding the full-time firefighter position. On June 1, 2009, the Board posted the final eligibility register: Soto placed third out of 19 candidates, with a score of 97.015.[1]

¶ 6    On May 19, 2011, the City of St. Charles eliminated its paid, on-call program. However, on May 23, 2011, the Board offered Soto a probationary appointment as a firefighter paramedic, "conditioned upon successfully passing" a psychological examination, background investigation, medical examination, functional capacity evaluation, and drug screen. The offer letter advised Soto that the starting salary for the position was $53,962, and enclosed were forms for him to complete and bring with him to his orientation. "Your start date will be determined and is specifically conditioned upon passage of all the aforementioned examinations." Soto was advised that he would be contacted by Denice Brogan of the City's human resources department to schedule postoffer testing, confirm the start date, and coordinate his orientation.

¶ 7    On June 16, 2011, Detective Andrew Lamela wrote a memorandum regarding his background investigation of Soto. That memorandum and accompanying documentation in the record reflects that Soto has no criminal history. Further, Soto received multiple medals and commendations in the Marine Corps.

¶ 8    Lamela briefly summarized that in February 2010 Soto was interviewed by the Geneva police department after he had allowed a friend's adult daughter, who was intoxicated, to spend the night at his house. Soto and the woman went to sleep in separate rooms; at some point, however, the two slept, fully clothed, in the same bed. The next day, the woman went to the hospital for unexplained bruises and pain and bleeding in her rectal area. The woman "was insistent that she was not accusing Soto of performing a sex act upon her," but she could not explain her injuries. The woman never accused Soto of sexual assault and later became uncooperative. Soto confirmed that there was no sexual contact between himself and the woman, and he was cooperative with questioning. No charges were filed against him.

¶ 9    On June 16, 2011, Lamela interviewed Soto regarding the position. He noted that Soto's "appearance was casual." Lamela reviewed with Soto his credit and military history, and they discussed why Soto wished to be a firefighter. They further discussed the aforementioned Geneva police report; Soto noted that (despite no charges having been filed) he had informed his supervisor at the St. Charles fire department of the incident. Lamela's report next states: "I asked [Soto] if he was going to continue to work at First Care Ambulance if he was hired with the St. Charles Fire Department. [Soto] stated that he would resign from First Care Ambulance if he was hired full time with the St. Charles Fire Department. I advised that I had no further questions for [Soto] and ended the interview."

---

[1]The top four scores were 99.600; 97.765; 97.015 (Soto); and 92.960.

¶ 10    Lamela's June 16, 2011, memorandum summarized his interviews with three of Soto's neighbors and, on September 21, 2011, Lamela amended his report to include summaries of additional interviews he conducted with persons who know Soto. We summarize below the interviews from both reports:

|   | NAME | RELATIONSHIP | COMMENTS |
|---|------|--------------|----------|
| 1 | Dawn Vance | Neighbor | Has known Soto for six years. Soto is very friendly, respectful, and always willing to help his neighbors. Soto helped Vance install a new shed door. He is very proud of his military service. Soto has never caused any trouble in the neighborhood, Vance is happy to have Soto as a neighbor, and she had nothing negative to say about him. |
| 2 | Ron Vial | Neighbor | Does not know Soto personally, but has seen him in the neighborhood. Soto has never caused any problems in the neighborhood, and Vial had nothing negative to say about him. |
| 3 | Scott McNees | Neighbor | Does not know Soto personally, but has seen him in the neighborhood and they exchange greetings. Soto has never caused any problems in the neighborhood, and McNees had nothing negative to say about him. |
| 4 | Greg Ingraham | Present employer and Supervisor/ First Care Ambulance | Has supervised Soto for one year. When asked if he had received any complaints against Soto, Ingraham stated that he has received complaints only from Soto's female coworkers. He stated that Soto has a bad attitude toward his female coworkers when he is partnered with them. Soto has been known for talking down to them. and ignoring their input when they have "on-calls." Ingraham stated that Soto had been disciplined for his actions toward his female coworkers and had been suspended for not completing his continuing education. Ingraham stated that, if assigned to work with a female coworker, Soto would not be fine to work with. Ingraham believes that Soto is not a hard worker, that he does only what he needs to do |

| | | | to get by, and that he is hard-headed and not much of a "people person." Ingraham stated that, if kept away from female coworkers, Soto might be "ok" as a firefighter. Soto has never been tardy and is always punctual. |
|---|---|---|---|
| 5 | Derek Piec | Present Employer and Supervisor/ St. Charles Fire Department | Piec was Soto's paid, on-call lieutenant and has known Soto for about 10 years. Piec stated that, while he served as Soto's supervisor, Soto was never late and never missed a day of work. He never received any complaints against Soto, and he described Soto as outgoing and a hard worker. He does not know of any shortcomings Soto might have. Soto has never been disciplined. Piec said that Soto would do well as a St. Charles firefighter and Piec had nothing negative to say about Soto. |
| 6 | Kevin Christensen | Present Employer/St. Charles Fire Department | Has known Soto since Soto began working as a paid, on-call firefighter (in 2004). Soto has a good work ethic and completes all assignments. Christensen described Soto as a hard worker and a "good guy." Christensen did not know of any shortcomings Soto might have, he believes Soto is a hard worker and would make a good firefighter, and he would be glad to have Soto in his department. Christensen did not have anything negative to say about Soto. |
| 7 | Anthony Centimano | Present Employer/St. Charles Fire Department | Centimano has worked with Soto for a few years. Soto is a "good guy" and very hard worker, never complains, and is very intelligent. Soto does not have any shortcomings, he would be a good firefighter, and Centimano did not have anything negative to say about Soto. |
| 8 | Tony Cavallo | Present Employer/St. Charles Fire Department | Cavallo has known Soto for around six years and worked with him at the fire department. He described Soto as a "great guy" and a hard worker who follows orders without questions. Cavallo stated that Soto has good character and is always |

| | | | willing to work, and he did not have anything negative to say about Soto. When asked whether he knew of any shortcomings Soto might have, Cavallo stated that, as a former Marine, Soto sometimes has "that type of attitude" and does not always look at other ways to do things, but that "this is not a bad thing." |
|---|---|---|---|
| 9 | George Koczwara | Former neighbor | Koczwara has known Soto for about five years and used to be his neighbor. Koczwara described Soto as a "very good guy," outgoing and friendly, with no known shortcomings. Koczwara said that Soto has always wanted to become a firefighter, is very dedicated to becoming one, takes orders well, has a great attitude, and is very enthusiastic. He believed Soto would make a great firefighter and he did not have anything negative to say about him. |
| 10 | Jamie Schindlbeck | Friend | Schindlbeck has known Soto for about 25 years; they met in grade school have been friends ever since. He stated that Soto is a great person, trusting, always willing to help, a best friend, and has no shortcomings. Schindlbeck stated that Soto would "do great" as a firefighter because he is very passionate about wanting to be a firefighter. He had nothing negative to say about Soto. |
| 11 | Richard McLaughlin | Friend's Father | McLaughlin explained that his son and Soto grew up together, and that he has known Soto for about 30 years. He described Soto as a "good guy," easygoing, and a nice person who gets along with everyone. Soto has no known shortcomings. McLaughlin stated that Soto has been looking forward to the opportunity of becoming a firefighter for a long time, and he would be a good firefighter because he is very dedicated to the job. McLaughlin had nothing negative to say about Soto. |

| 12 | Kevin Renner | Friend | Renner has known Soto since grade school, and they have been friends ever since. Soto is goal-driven, disciplined, hard working, fun loving, and someone who knows right from wrong. He remains calm and handles pressure well. When asked if he knows of any shortcomings Soto might have, Renner stated that Soto sometimes needs to have instructions reiterated and might ask for clarification, but, "once he gets it, he gets it." Renner said Soto would be an amazing firefighter and has always wanted to become one. Renner had nothing negative to say about Soto. |

¶ 11       According to Soto's complaint, on July 13, 2011 (prior to Lamela's amended report, such that only the interviews with neighbors had been conducted), Brogan contacted Soto and informed him that he was being denied a full-time position, most likely due to the results of his background check. After repeated inquiries, the specifics remained unexplained and, so, on August 18, 2011, Soto filed an administrative review action in Kane County. Soto's counsel was then informed that a decision regarding Soto's employment was still pending. Accordingly, on October 5, 2011, Soto voluntarily dismissed the Kane County lawsuit.

¶ 12       The next day, on October 6, 2011, Lamela amended his report for a second time. The second amended report states that Lamela was informed by his commander (to whom the memorandum was also addressed) that Soto was presently employed by Elgin Medi Transport (which Soto had listed as a present employer on his resume, but not the application). Lamela informed his commander that this was "new information." Lamela informed his commander that, when he first interviewed Soto, he asked Soto if the application was updated and whether he wished to make any changes (although this is not reflected in the initial memorandum). Soto did not offer any changes and, after going through the application, Soto did not make any changes. Further, Lamela noted that, in the initial interview, Soto was asked whether he would resign from First Care Ambulance if offered a firefighter position. Soto "at no point informed me that he was not employed with First Care Ambulance during this background investigation. [Soto] also never provided me with his current employment information even after I asked him if he wanted to update his application." Lamela then interviewed two persons at Elgin Medi Transport, who stated as follows:

|   | NAME | RELATIONSHIP | COMMENTS |
|---|------|--------------|----------|
| 1 | Thomas Crawford | Owner of Elgin Medi Transport | Soto has never been the subject of discipline or the target of an internal investigation, although, in June 2011, he was written up for being late to work on two occasions. Overall, Crawford believed Soto would be a good addition to the fire station. He explained that Soto would not be the first guy to clean the truck, but that he would do so if asked. He thought Soto would feel comfortable with the firehouse atmosphere. Crawford said that Soto had never been in trouble with his agency, and that he did not know why Soto would not have informed Lamela of his employment there. Crawford said that Soto would not be promotable within his agency, because physical appearance means a lot and Soto does not pay attention to his personal appearance. "There are some employees who shine their shoes before coming to work, and there are some employees who scrape their shoes before coming to work." Soto is the latter. Crawford had not worked on an ambulance for a few years and, because he would not know what it was like to work with Soto, he told Lamela to speak with Soto's supervisor. |
| 2 | Thomas Mikulski | Supervisor at Elgin Medi Transport | Soto is very easygoing, helpful, always on time, and never causes problems. As for the two tardy occasions in June 2011, Mikulski stated that Soto always calls if he is running behind. Mikulski stated that Soto works well with female employees and he has never received any complaints from female employees about Soto. Soto has never been disciplined or the target of an internal investigation. Mikulski did not know of any shortcomings Soto might have. He thinks Soto would make a great firefighter. |

¶ 13     On October 19, 2011, the Board held a meeting. The minutes reflect that, after a call to order and a roll call, the Board, at 5:09 p.m., retired to executive session to discuss "personnel." Twelve minutes later, at 5:21 p.m., the Board returned and voted to withdraw the conditional offer of employment with the fire department (the minutes do not mention Soto by name). Discussion was then had about considering changes to the rules and

regulations. The meeting adjourned at 5:35 p.m.

¶ 14    On November 1, 2011 (six months after the offer of employment), the Board wrote Soto that: "after review of employment and background information, [we] have made the decision to rescind the conditional offer of employment issued on May 23, 2011."[2]

¶ 15    Soto filed an action for administrative review on December 5, 2011. After receiving briefs on the issues, the trial court determined that, discounting and giving "no weight whatsoever" to the Geneva police report that resulted in no charges against Soto, the record contained interviews (specifically, with Thomas Crawford from Elgin Medi Transport and Greg Ingraham of First Care Ambulance) reflecting certain problems with Soto, including that he would not be promotable within Crawford's agency, that there had been complaints about Soto from female coworkers, that Soto had not complied with continuing education requirements, and that he was hard-headed and not much of a "people person." The court acknowledged "ample evidence" that painted a different picture of Soto, but determined that the fact that "negative reports exist" is sufficient to find that the Board's decision is not contrary to the manifest weight of the evidence. The court concluded, "As the defense noted, if there are other applicants with a better work history that are available, who is the court to tell the Board that they must overlook what might be significant information which weighs against hiring Mr. Soto." On June 22, 2012, the court denied Soto's motion for reconsideration.

¶ 16                                    II. ANALYSIS

¶ 17    Soto's arguments on appeal can be summarized as challenging the Board's failure to issue standards for passing the background examination and its failure to issue findings for the trial court to review. He also argues that the record the trial court reviewed was replete with evidence that was either irrelevant or inadmissible hearsay.

¶ 18    The Board asserts that Soto clearly knew the standards for employment and that, because his offer of employment was conditioned on a background check, Soto had no claim to the firefighter position. The Board does not, however, directly dispute Soto's claim that it failed to make any findings. Instead, it argues that the record contains evidence to support its decision, such as: (1) Ingraham's report that Soto had a bad attitude toward female coworkers, is hard-headed, and is not much of a "people person"; and (2) Crawford's report that Soto had been disciplined for reporting late to work and would not be promotable within Crawford's company (because he did not pay attention to his personal appearance). The Board questions whether it should have to hire an applicant who is not a hard worker or a "people person," and is hard-headed and unkempt, "when other applicants with a better work history may be available." The Board also notes that it could be liable for negligent hiring if, despite the report of Soto's poor attitude toward women, it were to hire him and he were later charged with sexual harassment or sexual abuse. For the following reasons, we agree with Soto that the Board's failure to make findings regarding its hiring decision requires a

_____

[2]There is no dispute that Soto successfully satisfied the other conditions of the offer (psychological examination, medical examination, etc.).

-9-

remand for it to do so.

¶ 19    Before delving into the substantive issues, we provide some background of the statutory provisions, goals, and standards that guide our review. First, the Board's hiring process falls under the purview of the Illinois Municipal Code (Municipal Code) (65 ILCS 5/10-2.1-1 *et seq.* (West 2010)), which, in section 10-2.1-6, establishes requirements for the examination and disqualification of fire department applicants (65 ILCS 5/10-2.1-6 (West 2010)). The Municipal Code provides that the Administrative Review Law (Review Law) (735 ILCS 5/3-101 *et seq.* (West 2010)) applies to and governs proceedings for judicial review of final administrative decisions of boards of fire and police commissioners. See 65 ILCS 5/10-2.1-17 (West 2010); see also *Burgess v. Board of Fire & Police Commissioners*, 275 Ill. App. 3d 315, 320 (1995) ("*all* final decisions rendered by boards of fire and police commissioners constituted under the [Municipal Code], including those regarding hiring, are reviewable exclusively under the Administrative Review Law" (emphasis in original)); *Mueller v. Board of Fire & Police Commissioners*, 267 Ill. App. 3d 726, 731-32 (1994) (the Review Law provides the exclusive method of review of all final decisions, including hiring decisions, of a board).

¶ 20    The Board's hiring decisions are subject to review because there exist important statutory objectives for hiring applicants on the basis of ability and merit. *Mueller*, 267 Ill. App. 3d at 731-32.

    "[T]he legislature intended that the Board promulgate rules to provide for the orderly appointment and promotion of employees based on public, competitive, qualifying examinations and for the removal of such employees only for cause. [Citation.] These functions are intertwined in the rules provisions which are intended to provide for a unified system–premised on merit, the ability to perform, and good character–for the employment, retention, and discharge of members of fire and police departments." *Id.*

The Municipal Code's statutory scheme seeks to "guarantee access to eligibility for employment based on fair consideration of the applicants' qualifications." *Id.* at 732. Accordingly, "[i]t is the court's duty to protect the rights of applicants for employment and *to make certain* that a denial of employment is predicated upon proper legal principles." (Emphasis added.) *Id.* at 734; see also *Cremer v. City of Macomb Board of Fire & Police Commissioners*, 260 Ill. App. 3d 765, 767 (1994).

¶ 21    In keeping with the Municipal Code's intention that appointments to fire department positions are public and premised on merit, once Soto achieved placement on the eligibility list, he acquired a legal right to ensure that the decision to deny him employment was not contrary to the manifest weight of the evidence or based on improper factors.[3] See *Cremer*, 260 Ill. App. 3d at 766. "The posting of an eligibility list carries legal significance. [Citation.] While it does not give a candidate a vested right to a position, it does give the candidate

_____

        [3]Here, there is no challenge to Soto's standing to bring this lawsuit or to the propriety of placing Soto on the eligibility list that, in turn, gave rise to that standing. Indeed, the Board agrees that, when it posted its eligibility list, Soto became eligible and, in turn, acquired standing to ensure that proper hiring procedures were thereafter followed.

-10-

standing to assert that the procedure created by the statute has not been followed." *Id.* As such, although the Board is correct that Soto had no entitlement to the position, its decision rejecting Soto for the position remains one "which affects his legal rights, duties or privileges" and, accordingly, is subject to our review. *Mueller*, 267 Ill. App. 3d at 734; *Schickedanz v. City of O'Fallon*, 248 Ill. App. 3d 746, 748 (1993) (board's notification to the plaintiff, who had been placed on a final eligibility roster, that he would not be hired constituted a final administrative decision that affected the legal rights, duties, and privileges of the plaintiff and was, therefore, subject to review).

¶ 22     In a case arising under the Review Law, we review the decision of the administrative agency, not the determination of the trial court. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504 (2007). The administrative body has a duty to provide the trial court with a sufficiently complete record of proceedings. *Mueller*, 267 Ill. App. 3d at 733. Our review extends to all questions of law and fact presented by the record (*Wade*, 226 Ill. 2d at 504), and the findings and conclusions of the administrative body on questions of fact shall be held to be *prima facie* true and correct. 735 ILCS 5/3-110 (West 2010). The reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence, *i.e.*, whether the opposite conclusion is clearly evident. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998). Nevertheless, while we may not reweigh the evidence, we will seek to determine whether the decision of the administrative body is " 'just and reasonable in light of the evidence presented.' " *Murbach v. Anderson*, 96 Ill. App. 3d 1015, 1018 (1981) (quoting *Davern v. Civil Service Comm'n*, 47 Ill. 2d 469, 471 (1970)).

¶ 23     Here, our ability to ascertain whether the Board's findings that resulted in its rescission of the employment offer were contrary to the manifest weight of the evidence is constrained because the Board *made no findings* as to the basis of its decision. The record reflects only that the Board retired to executive session to discuss "personnel"; it then issued a letter to Soto stating that, upon its "review of employment and background information," the conditional offer of employment was rescinded. The Board does not assert on appeal that it did, in fact, make findings. Instead, it argues that certain statements or information in Lamela's report are sufficient to support its "opinion." We, however, do not know what single factor or combination of factors the Board (as opposed to counsel offering argument on the Board's behalf) considered fatal to Soto's employment. As the record is silent regarding what findings it determined rendered Soto ineligible for employment, the Board could have, theoretically, withdrawn the offer for improper reasons. For example, although the Board suggests on appeal that Lamela's report included information speaking to Soto's character (see 65 ILCS 5/10-2.1-6(j) (West 2010) (no person shall be appointed to the fire department unless he or she is a person of good character)),[4] the Board made no *finding* that

---

[4]Section 10-2.1-6(j) of the Municipal Code continues that no person may be appointed if he or she is a habitual drunkard, gambler, or if he or she has been convicted of a felony or a crime involving moral turpitude. Nevertheless, with a few specified exceptions, a candidate may *not* be disqualified on the basis of a record of misdemeanor convictions or of arrests (for any reason) that resulted in no conviction. 65 ILCS 5/10-2.1-6(j) (West 2010).

Soto was not a person of good character, let alone its bases for so finding.

¶ 24    The Board's arguments on appeal, pointing us to evidence in the record that *could* support its decision, essentially suggest that explicit findings are unnecessary where the basis for its decision might be obvious upon reviewing the record. Indeed, the trial court essentially adopted this approach where it found that, as long as two negative reports were present in the record, there was a basis for the Board's decision and it was not contrary to the manifest weight of the evidence. However, we do not agree with this approach: it puts this court in the position of doing what the Board was obligated to do–identifying in the record reasons that could justify the Board's decision. This ultimately puts us in a position of advocacy for the Board.

¶ 25    We find instructive the decision in *Schmeier v. Chicago Park District*, 301 Ill. App. 3d 17 (1998), where the court faced a similar dilemma. There, the court was asked to review a personnel board's decision that lacked factual findings. The personnel board argued that its findings were implicit, were supported by the record, and were not contrary to the manifest weight of the evidence. The court, however, declined to:

> "adopt the Board's suggested *modus operandi* and (1) assume that it made factual findings that would render its order not an abuse of discretion, (2) search the record to figure out what such findings it could have made, and (3) uphold those findings that we guess the Board to have made unless they are against the manifest weight of the evidence. There are serious problems with this suggested approach, not the least of which is that it would appear to eliminate the possibility of a finding that the agency had abused its discretion. When an agency states its factual conclusions and states what action it is taking based on those findings, this court may determine whether the agency has abused its discretion and will reverse when it has done so. [Citation.] Under the Board's proposal there is no possibility of such a finding unless its findings are against the manifest weight of the evidence, because we must assume that the agency made factual findings which would support its action. Effectively, this court would be an advocate for the agency." *Id.* at 33-34.

¶ 26    The court in *Schmeier* further noted that, where there could be multiple bases for the agency's decision, yet no findings were made, the appropriate course of action is generally to remand the case to the agency for it to make findings.[5] *Id.* at 34; see also *Mueller*, 267 Ill. App. 3d at 734 (where the plaintiff's name was removed from the eligibility list for a firefighter-paramedic position for allegedly failing a psychological examination, but the board did not provide any details concerning the failed examination, the court noted that the trial court has the power to make any order that it deems proper to obtain from the board a record sufficient for judicial review; it reversed and remanded for the board to provide appropriate documentary evidence concerning its decision so that the court could examine

---

[5]Interestingly, in *Schmeier*, the court did *not* remand: it determined that the record reflected only one possible basis for the personnel board's decision and that this finding, if it were to be made on remand, would be contrary to the manifest weight of the evidence because it would be based on incredible testimony and hearsay. *Schmeier*, 301 Ill. App. 3d at 35-36.

whether the decision was proper); *Cremer*, 260 Ill. App. 3d at 766-67 (where the board refused to hire the plaintiff as a firefighter because he allegedly failed a mental examination, but it withheld the results of the plaintiff's examination, the court, after reiterating its duty to protect applicants for employment and to ensure that denial of employment is based on proper legal principles, noted that it could not fulfill that duty if the board were allowed to withhold the results of the plaintiff's examination; the court reversed and remanded, ordering that the results be provided to the plaintiff as part of the evidence before the board). Here, we agree with the foregoing authority that, where there could be multiple bases for the decision, but no findings are made, remand for the Board to issue findings is appropriate.

¶ 27    Also, the Board's decision to rescind an offer of employment to Soto, who achieved placement on the eligibility list, might have meaningful *future* repercussions for him, as reflected by the fact that the Board's own application for employment asks applicants whether they have ever been placed on a civil service list only to be subsequently *either not hired or rejected*. Because the Board's decision could affect Soto's ability to obtain such positions in the future, and given the Municipal Code's parameters, it is incumbent on a reviewing court to determine whether the Board relied on improper factors in removing Soto from the list or whether its decision was against the manifest weight of the evidence. Instead, Soto and this court received only a conclusion, *i.e.*, the decision, and the Board asks us to simply assume that its conclusion was based on the two reports to which it directs our attention on appeal (Ingraham and Crawford).[6] While we agree that even one piece of credible information may theoretically outweigh other evidence, here the Board provided no findings as to whether it, in fact, relied on those reports, why it relied on those reports, or whether it relied on any potentially improper factors present in the record. Again, we have no findings to explain why the Board came to its decision and we will not make assumptions on the Board's behalf.

¶ 28    We disagree with Soto that an evidentiary hearing must be held before a hiring decision is made. The Municipal Code provides that hearings must be conducted only when removing or discharging a member of the fire department (65 ILCS 5/10-2.1-17 (West 2010)), not when denying an applicant a position. Contrary to Soto's assertion, section 10-2.1-6(j) does not suggest otherwise. That provision, after summarizing that only certain misdemeanor and other convictions may disqualify a person, states that "[a]ny such person *who is in the department* may be *removed* on charges brought and after a trial as provided in this Division 2.1." (Emphases added.) 65 ILCS 5/10-2.1-6(j) (West 2010). We read this sentence to mean that persons already appointed who are convicted of one of the disqualifying crimes may be removed only after a hearing in compliance with section 10-2.1-17. See also *Beazley v.*

_____

[6]On appeal, the Board makes no argument that the Geneva police report supports its conclusion. Indeed, at oral argument the Board conceded that, as there were no charges brought against Soto, and as even most misdemeanor convictions are not sufficient bases for disqualification from employment (see 65 ILCS 5/10-2.1-6 (West 2010); *Murbach*, 96 Ill. App. 3d at 1019 (finding board's rejection of an applicant for drug use both contrary to the manifest weight of the evidence and contrary to law)), it would be legally improper to view that incident as a basis to disqualify Soto from employment.

*Wosik*, 119 Ill. 2d 437, 440 (1988) (after the city's personnel department decided not to hire him, an applicant for employment as a probationary police officer had no right to a hearing to review his qualifications for the position; the supreme court noted that there was no statute or rule creating such a right, the city's personnel rules provided grievance hearings only for those already employed, and probationary police officers may be discharged without a hearing and, so, it follows that an unsuccessful applicant for the position of probationary police officer need not be given a hearing).

¶ 29 Further, we note that we do not agree with Soto that the Board could not consider hearsay evidence, for even the positive reports about him are hearsay. Finally, we do *not* find practicable Soto's suggestion that the Board must issue standards for achieving a passing score on the background check; rather, it is inherent in any background check that the information derived therefrom will be considered alongside other information (applications, resumes, interviews with the candidate, etc.), and the inquiry is then whether, in light of all the information before it, the Board's decision was contrary to the manifest weight of the evidence.

¶ 30 Nevertheless, the aforementioned questions about what the Board considered, what weight it gave to some reports, and whether or why those reports reflect on a disqualifying factor as outlined in the Municipal Code all highlight the importance of the requirement that the Board issue findings for its decision. Our inability to ascertain on review what the Board did or did not do, and what it did or did not consider, makes remand necessary.

¶ 31 Finally, because we have no findings to review and do not know what the Board relied on to make its decision, we decline to address the Board's argument that, if it were to ignore the negative reports of Soto's attitude toward women and Soto were later charged with sexual harassment or sexual abuse, the Board could be subject to a negligent-hiring lawsuit. Our analysis of this argument would be speculative, given that it is based on reports that might or might not have formed the basis of the Board's decision.

¶ 32 In sum, it is our responsibility to ensure that the Board followed legal parameters in making its decision, and, because there are no findings, we cannot do so. We reverse and remand for the Board to make factual findings regarding its decision (the Board may, if it deems necessary, reopen its investigation of Soto's application). Specifically, if on remand the Board determines that the offer should remain rescinded and that Soto is disqualified from employment under the Municipal Code, it must issue *findings* as to why, based on the record, it came to that conclusion. See *Mueller*, 267 Ill. App. 3d at 734 ("the circuit court has the power to make any order that it deems proper to obtain from the administrative agency a record sufficient for judicial review").

¶ 33                                    III. CONCLUSION

¶ 34 For the foregoing reasons, the judgment of the circuit court of Kane County is reversed and the cause is remanded.

¶ 35 Reversed and remanded.

-14-